

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00193-CR

KIMBERLY DANIELLE MILWICZ                    APPELLANT

V.

THE STATE OF TEXAS                                STATE

----------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
### TRIAL COURT NO. CR12256

----------

### MEMORANDUM OPINION[1]

----------

Appellant Kimberly Danielle Milwicz appeals her conviction for murder.  In two issues, she argues that the evidence is insufficient to sustain her conviction and that the trial court erred by admitting part of her recorded interview with police officers.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## Background Facts

Gene Sabin managed TJ's, a bar and restaurant in the Oak Trail Shores area of Hood County. He worked there during early mornings and afternoons. In the summer of 2011, appellant began working there. She did not have a permanent residence, so Sabin lent her money and allowed her to stay in his house.

In late December of that year, Sabin fired her. According to an employee of the bar, Brandy Shirley, Sabin fired appellant because he learned "who she was hanging out with . . . and that she was doing drugs." Sabin's niece, Frances Barnes (who also worked at TJ's), testified that he had fired appellant because she was using methamphetamine. Sabin allowed appellant to continue living at his house for a few days after he fired her but eventually told her to leave.

On Martin Luther King, Jr. Day (January 16) in 2012 and the weekend preceding it, TJ's was open for business. Banks, however, were closed on the holiday. On the weekend before the holiday, Sabin suffered a stroke but continued working at the bar. Because of the stroke, he could not speak and had trouble writing; through urging by his family, he planned on going to a Veterans Affairs hospital on the Tuesday following the stroke. At some time during the holiday weekend, Shirley called appellant to inform her of Sabin's stroke and to ask her to return his house keys.

On January 17, Shirley arrived at the bar at about 6:15 a.m. (before it was set to open at 7 a.m.) to prepare a bank deposit of money collected during the

holiday weekend. She noticed that Sabin's car was parked in its normal spot but that doors to the bar had been forced open. Upon walking into the bar, she saw Sabin on the floor. She first believed that he had suffered another stroke, so she yelled for him to wake up. When she noticed that he was not breathing, she tried to use the bar's phone to call for help, but the phone cord had been damaged. Shirley ran to a nearby convenience store and called 911, telling the operator that she had found "blood everywhere" and that the bar's phone had been ripped out of the wall.

Responders to the scene determined that Sabin had been dead awhile. They saw a puncture wound on his neck and noticed blood near his head. They also noticed that money had been taken from various parts of the bar, including wooden lockers and a metal lockbox that appeared to have been opened with keys. Sabin's autopsy revealed that he had been shot in the front of his neck and that the bullet had not exited his body.

On the day of the murder, Barnes went to Sabin's house. She noticed that appellant's car, which had windshield damage, remained at the front of the house. Also, some of appellant's possessions remained in the house. The doors to the house were locked, and Barnes could not enter it. Later that day, when Barnes returned to the house, she saw a ladder leaning against a bathroom window and noticed that appellant's car and possessions were gone.

Sabin's sons, Brian and Randy, changed the locks on Sabin's house because they learned that his keys were missing after his murder. Two witnesses testified that Sabin's keys were never found.

Michael Stoner, a Texas Ranger, investigated the murder. He determined that the murder was committed by someone who entered and left through the bar's front door. He saw a spent shell casing in a sink, noticed that there was no cash in the register (indicating that a robbery had occurred), and saw that padlocks on lockers had been opened with a key rather than through using bolt cutters. He also observed a shoeprint near a damaged door inside the bar. Based on information that the police received, in two houses, they found money believed to be related to the robbery and murder.

After talking to several people, Ranger Stoner suspected that appellant, Justin Ragan, and Gordon Lewis,[2] appellant's "off-and-on" boyfriend, may have been involved in the murder.[3] Ranger Stoner, along with other officers, found Ragan at a hotel, arrested him, and seized his shoes and "large rolls of bills" that he possessed. Ragan's right shoe matched the shoeprint found at the murder scene. Ragan had called 911 on the morning of the murder, alleging that his truck had been stolen.

---

[2]Lewis was affiliated with the Aryan Brotherhood and was known as "Flash" because he could change moods quickly and acted differently while on drugs.

[3]Ragan and Lewis had visited the bar occasionally. Lewis had been barred from entering the bar because he had threatened an employee.

4

Ragan admitted that he had shot Sabin during the robbery at TJ's, and he stated that Lewis had given him the gun and had driven him to and from the bar.[4] The officers learned that Ragan had paid for his hotel room with cash and found methamphetamine paraphernalia there. Ranger Stoner wanted to contact appellant, and based on his conversations with people who knew where she had gone, on January 18, he called another Texas Ranger, Kevin Wright, who was working in El Paso.

After learning that appellant was "possibly a suspect" and had checked into a hotel in Las Cruces, New Mexico, Ranger Wright asked a New Mexico police officer to watch appellant's car until he could arrive. When Ranger Wright arrived at the hotel and appellant saw him there, she immediately asked, "Is this about Gene?" Ranger Wright confirmed that he was there to talk about Sabin's murder, and appellant agreed to ride with him to a New Mexico state police office. Based in part on statements made during an interview that night indicating that the idea of committing a robbery at TJ's came from appellant and that she had talked to Lewis about how and when to commit that crime, she was later arrested in New Mexico pursuant to a warrant.

---

[4]Ragan said that he had locked Sabin in a closet and that he did not plan on shooting Sabin until Sabin escaped from it. Ranger Stoner was skeptical about Ragan's ability to put Sabin, who was over six feet tall, in the closet, which was small.

A grand jury indicted appellant, through multiple alternative paragraphs, with murder and capital murder.[5] She filed several pretrial motions, including a motion to suppress the audio recording of her interview with Ranger Wright. The trial court denied the motion to suppress in part, allowing the admission of the first two hours and fourteen minutes of the statement but excluding its remainder. The court found that appellant had not received *Miranda*[6] warnings before participating in the interview but that the warnings were not required during the first part of the interview because she was not arrested or otherwise in custody.[7] The court also found that appellant gave the interview intelligently and voluntarily, without induction by promises or threats. The court noted in its order denying appellant's motion that she had voluntarily accompanied Ranger Wright to the police office, that she was not handcuffed, that Ranger Wright had told her that she was not required to speak to him, that Ranger Wright had allowed her to use her cell phone several times during the interview, and that she had told her father at the end of the interview that she was not being detained.

---

[5]*See* Tex. Penal Code Ann. § 19.02(b) (West 2011), § 19.03(a)(2) (West Supp. 2013).

[6]*See Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 1630 (1966).

[7]At the two-hour-and-fourteen-minute mark of the interview, Ranger Wright informed appellant that a warrant was being prepared for her arrest. The trial court, pursuant to the State's concession and citing *Dowthitt v. State*, found that appellant's custody began when Ranger Wright made that statement. 931 S.W.2d 244, 254–55 (Tex. Crim. App. 1996).

At trial, appellant pled not guilty. Upon hearing the parties' evidence and arguments, the jury convicted her of murder. The jury received evidence on her punishment and assessed confinement for life. She unsuccessfully sought a new trial and brought this appeal.

**Evidentiary Sufficiency**

In her first issue, appellant contends that the evidence is insufficient to support her murder conviction. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011). We determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing

7

the guilt of an actor. *Winfrey*, 393 S.W.3d at 771; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is insufficient when acquittal is the "only proper verdict." *See Johnson v. State*, 419 S.W.3d 665, 670 (Tex. App.— Houston [1st Dist.] 2013, pet. ref'd) (citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S. Ct. 2211, 2218 (1982)).

Appellant's indictment alleged, in part, that she committed murder because on January 17, 2012 in Hood County, she

> did then and there intentionally or knowingly commit or attempt to commit an act clearly dangerous to human life, to wit: shooting [Sabin] with a firearm, that caused the death of [Sabin], and the defendant was then and there in the course of intentionally or knowingly committing a felony, to wit: robbery, and said death of [Sabin] was caused while the defendant was in the course of and in furtherance of the commission or attempt of said felony[.]

The jury charge tracked this part of the indictment, defined robbery,[8] and contained language explaining that appellant could be criminally responsible for Ragan's and Lewis's conduct as a party to the offense under certain circumstances.[9]

---

[8]The jury charge correctly stated that a person commits robbery "if, in the course of committing theft and with intent to obtain and maintain control of property of another, he intentionally or knowingly causes bodily injury to another." *See* Tex. Penal Code Ann. § 29.02(a)(1) (West 2011).

[9]"It is well accepted that the law of parties may be applied to a case even though no such allegation is contained in the indictment." *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989), *cert denied*, 502 U.S. 961 (1991); *see Murkledove v. State*, No. 02-12-00194-CR, 2014 WL 2013438, at *2 (Tex. App.— Fort Worth May 15, 2014, no pet. h.).

A person commits murder by committing or attempting to commit a felony, other than manslaughter, "and in the course of and in furtherance of the commission or attempt, . . . [the person] commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(3). Furthermore, if in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, "though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." *Id.* § 7.02(b) (West 2011).[10] A person engages in a criminal conspiracy if, with the intent that a felony be committed, the person agrees with one or more persons that "they or one or more of them" engage in conduct constituting the offense, and one or more of them performs an overt act in accordance with the agreement. *Id.* § 15.02(a) (West 2011).

Cumulating all of these penal code provisions and applying them to the facts of this case, the evidence[11] is sufficient to prove appellant's guilt for murder

[10]Because we hold below that the evidence is sufficient to support appellant's guilt for murder through her participation in a conspiracy under section 7.02(b), we need not determine whether the evidence is sufficient to prove her guilt as a party under section 7.02(a)(2). *See* Tex. Penal Code Ann. § 7.02(a)(2); Tex. R. App. P. 47.1; *Washington v. State*, 417 S.W.3d 713, 723 n.7 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

[11]A reviewing court may look to "events before, during, and after the commission of the offense" to determine whether an individual is a party to an

9

if it shows that (1) with the intent that robbery be committed, she agreed with Ragan or Lewis for one of them to engage in the conduct of robbery, (2) Ragan or Lewis performed an overt act according to the agreement, (3) in committing the robbery, Ragan or Lewis committed an act clearly dangerous to Sabin's life that caused his death, and (4) the murder was committed in furtherance of the robbery and should have been anticipated in carrying out the robbery. *See id.* §§ 7.02(b), 15.02(a), 19.02(b)(3); *Lee v. State*, No. 01-07-00992-CR, 2009 WL 1562861, at *3 (Tex. App.—Houston [1st Dist.] June 4, 2009, pet. ref'd) (mem. op., not designated for publication) ("Under the law of parties, a defendant may be convicted of the offense of felony murder, even when the defendant does not intend to commit murder, if the murder is committed in furtherance of the unlawful purpose and should have been anticipated as a result of the carrying out of the conspiracy."); *see also Turner v. State*, No. 01-08-00657-CR, 2010 WL 3062013, at *5 (Tex. App.—Houston [1st Dist.] July 30, 2010, no pet.) (mem. op., not designated for publication) ("Under the law of parties, if Turner conspired with Brown to rob the [store's owner], Turner could be held criminally liable for . . . murder committed by Brown, even if Turner had no intent to commit . . . murder, if Brown committed the murder in an attempt to carry out the conspiracy to commit robbery and if Brown's actions should have been anticipated by Turner as a result of the carrying out of the conspiracy." (footnotes omitted)).

---

offense, and it may rely on circumstantial evidence to prove party status. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012).

We construe appellant's brief as challenging only the first of these requirements; she does not explicitly argue, for example, that the murder was not committed in furtherance of the robbery or that it should not have been anticipated. She contends that there is "no evidence that she entered into any kind of an agreement with Lewis and Ragan to rob TJ's or kill Sabin." Appellant emphasizes that no evidence links her to being at the scene of the robbery and that she was in a hotel "across town" when the murder occurred. We must determine whether there is sufficient evidence "of an understanding and common design to commit the offense." *Gross*, 380 S.W.3d at 186.

Robert Eubank, who lived close to Lewis, testified that shortly before the murder, appellant was "having problems" with Lewis and stayed at Eubank's house for about a week. Three to five days before the murder, while appellant was in an angered mood and was possibly intoxicated, she told Eubank that she "had dreams about hitting [Sabin] in the head with a ball peen hammer." She also told Eubank that she hated Sabin. Eubank believed that appellant was emotionally unstable.

One day before the murder, appellant went to Eubank's house, had a couple of beers, and said that she was going to Lewis's house. Later that night, Ragan and Lewis, along with several other people, went to Eubank's house. Ragan's girlfriend, Christina Munoz, told Eubank that Lewis and Ragan were planning to "hit a lick." Eventually, well into the early morning on the day of the murder, Ragan and Lewis left Eubank's house in Ragan's truck. Later that

11

morning, Ragan returned to Eubank's house. While acting frantically and nervously, Ragan told Eubank that he had shot Sabin. Ragan told Christina "where to find the money."

Rebecca Cleere, who is a friend of Lewis's sister, Sandra Smith, testified that at some time during the week prior to the murder, Smith, Ragan, Lewis, and appellant went to Cleere's double-wide trailer. All of those people began talking in a room of the trailer. During that time, appellant began "ranting and raving about how she had gotten fired and how she [had] lost her place to live, and she was very upset with [Sabin], and [Lewis] was talking about going in on a robbery, to rob the place." Appellant said during the conversation that she wanted to see Sabin "beat[en] to a bloody pulp"; she explained that she wanted Sabin "to be beat and hurt and in pain like she was." While Cleere was speaking primarily with appellant, Lewis spoke to Ragan about joining in the crime in a conversation "on the other side of the room." But according to Cleere, the room that the conversations occurred in was small, so everyone could hear what others were saying.

When the State asked Cleere whether appellant was "involved in telling [Ragan] what she wanted to see happen" to Sabin, Cleere responded affirmatively. Cleere testified that at the end of the conversation, Lewis, Ragan, and appellant left her house together. Cleere did not believe after the conversations, however, that a crime at TJ's would occur. According to Cleere,

Lewis and appellant induced Ragan to "go in on the deal" by saying that he could "go with them to . . . smoke some dope."

After Ranger Wright found appellant at the hotel in Las Cruces, the first thing that appellant said to him was, "Is this about Gene?" During Ranger Wright's interview with appellant that night, she said that she had lived with Sabin for several months starting in the summer of 2011, that he had fired her in late December 2011, and that he had said that she could still live with him after firing her until January 1, 2012, when he "kicked [her] out." According to statements that appellant made toward the beginning of the interview, Sabin fired her because she served a soft drink without "mark[ing] it down," and he told her to leave his house because he did not like her dog. Appellant referred to Sabin as her "savior"; she explained that he treated her well and gave her money and that she thought of him as her uncle. She stated, however, that Sabin had yelled at her while she was working at the bar because she had once called the police to the bar.

Appellant said that Sabin arrived at the bar every day at about 4 a.m. and would stay there "all day" to watch the bar and protect its employees. She stated that she learned about Sabin's death through a text message and phone calls. She said that before she left Hood County, some people had expressed belief that she had a role in causing his death.

After prompting from Ranger Wright to "come clean," appellant said that she had talked with Lewis more than once (on separate days) about why no one

13

had ever committed a robbery at TJ's and that Lewis then said that he wanted to commit a crime at the bar and asked for the best days to do so and the best way to get in.[12]  Appellant indicated that she mentioned the possibility of committing a robbery at TJ's to Lewis because stress about his child support debt had caused him to "hat[e] on [her]" and "put his hands" on her.  Appellant said that Lewis had previously held a knife to her neck and had pointed a gun at her.

Nonetheless, appellant later told Ranger Wright that committing a robbery at TJ's was a "frivolous idea" and was not a way to get money for Lewis, and she claimed that she "wasn't part of the plan" and "wanted nothing to do with it."  She described her conversations with Lewis about the potential robbery as "big talk" and "wolfing."

But appellant detailed to Lewis how to commit the robbery.  Specifically, she told Lewis that Fridays and Saturdays would be the best days to commit the robbery.   She also told Lewis "how to do it"[13] and where the bar's money was kept, including that wooden lockers within the bar would contain a substantial amount of cash.   Testimony at trial established that TJ's employed three bartenders every day and that each of those bartenders kept money in a bag that was placed inside a padlocked locker.  Sabin had the keys to the padlocks.

---

[12]Appellant characterized herself as "throw[ing] the idea [of committing a robbery at TJ's] out there."

[13]For example, Lewis suggested going through a side door at the bar, but appellant told him that the side door had recently been replaced.

14

When Sabin was murdered, the lockers had been opened, and money had been removed from the bags.

While appellant admitted during her interview with Ranger Wright that she heard Lewis say that he was going to commit the crime, she expressed that she did not believe that he would actually do so. She also stated that Lewis had proposed that he could "pull a pistol" on Sabin but that she had told him not to.

Appellant said during the interview that in her discussion with Lewis about a potential robbery at TJ's, she said that she could be a good getaway driver but that she "didn't want to do it." According to appellant, she told Lewis that she did not want to "be involved."

Although Eubank testified that appellant saw him and went to see Lewis on the day before the murder, appellant told Ranger Wright that she had not spoken to Lewis in the few days before the murder and that on the morning of the murder and the night preceding it, she was in bed at her hotel. She denied knowing of anyone named "Justin" but said that she had talked about the potential robbery in the presence of someone named "Ray Ray."

Krista Smith, a Hood County probation officer, testified that she began supervising probation for appellant in June 2011, that she was still appellant's probation officer in January 2012, and that a few days before the murder, she received a message from appellant stating that she had gone to California to attend her mother's funeral. Smith testified that she had called appellant on January 18 (the day after the murder) and that appellant had called her back that

15

day. When appellant returned the call, she indicated that she was still in California and said that she was not sure when she could come back. Smith later learned from appellant's father that appellant was never in California, and she testified that to her knowledge, no funeral occurred.

Appellant's father testified that in January 2012, he had not spoken to appellant in two years, but she called him while stating that she wanted to come to California.[14] Appellant told him that "people were stealing her belongings, beating her up, [and] not allowing her to take her things with her." Because appellant needed time to replace a car battery and repair a smashed windshield, her father paid for her to stay in a hotel from January 14 through 17, when she left for California. He also provided money for the windshield's replacement.

Appellant's father testified that before Sabin's murder, appellant talked about him and was sympathetic about his having a stroke. He also stated that after the murder, while crying, she told him that Sabin was dead. He stated, however, that appellant had never told him about discussing how to commit a crime at TJ's with Lewis.

Stephanie Houghtaling worked at TJ's during the time that appellant worked there and allowed appellant to move into her house "until she got on her feet." According to Houghtaling, although several employees of TJ's came to the bar upon learning of Sabin's murder, appellant did not do so.

---

[14]Appellant grew up in California and moved to Texas only about a year or two before Sabin's murder because of disputes with her father.

16

From appellant's statements before the murder and during her interview with Ranger Wright, the jury could have rationally inferred that she conspired with Lewis (who joined with Ragan)[15] to commit robbery of Sabin. Specifically, the jury could have found appellant's participation in a conspiracy to rob Sabin from appellant's statements to Eubank, Cleere, and Ragan that she desired to violently harm Sabin (especially as coupled with the fact that Ragan murdered Sabin soon afterward); her involvement in a discussion in Cleere's trailer about robbing Sabin and her encouragement (along with Lewis) for Ragan to "go in on the deal" (especially as combined with the fact that Ragan and Lewis robbed Sabin soon afterward); and her admissions that committing a robbery at TJ's was her idea and that she had spoken with Lewis, who she knew was violent and needed money, about the best days and means to commit the robbery.

Likewise, the jury could have rationally inferred that appellant joined in the robbery conspiracy by her odd behavior near the time of Sabin's murder. For example, she told Krista Smith before the murder that she had traveled to California when she had not (possibly attempting to set up a false alibi); did not go to an appointment with her probation officer on the Friday before the murder; did not go to TJ's after hearing of Sabin's murder like some of the bar's

---

[15]Contrary to an argument in appellant's brief, the State was not required to prove that appellant conspired with both Lewis and Ragan; rather, the penal code required the State to prove that appellant agreed with "*one or more* persons that they *or one or more* of them" would engage in the robbery. *See* Tex. Penal Code Ann. § 15.02(a) (emphasis added).

employees did but instead went to his house, retrieved her car and personal items, and left Texas while having no apparent contact with anyone close to him; and began traveling to California on the day of the murder, even though she had not talked to her father, who lived there, in the two years preceding the week of the murder.

And the jury had a rational basis to doubt appellant's credibility and to therefore reject allegations in her interview that she did not conspire with Lewis to commit the robbery but only provided the idea and details about how to do so. Appellant made statements during the interview that contradicted each other and contravened evidence presented at trial. For example, appellant said at various times during the interview that the reason Sabin fired her at TJ's was because she was receiving disability benefits, because she had not properly charged a customer for soda, because effects from her bipolar disorder frustrated Sabin, and because she had once called the police out to the bar. She also said that she did not "do dope." But the jury learned from two witnesses who worked at TJ's that Sabin fired appellant because of her drug use, and Eubank testified that appellant used methamphetamine.

Also, although appellant said that she last spoke to Lewis several days before the murder, Eubank testified that appellant went to see Lewis after leaving his house on the day before the murder. And although appellant informed Krista Smith a few days before the murder that she had left for California to attend a funeral, the evidence shows that appellant did not leave Texas until after the

18

murder was committed and that she was not going to California for a funeral. Finally, while appellant represented to Ranger Wright and her father that she esteemed Sabin, witnesses testified that she had expressed hate toward Sabin and had talked about a desire to see him violently harmed.

We recognize that some evidence, if credited to appellant's favor, weighs against the finding of a conspiracy between appellant, Lewis, and Ragan on the date of the robbery. For example, one of appellant's acquaintances, Joshua Jenkins, testified that approximately four days before the murder, he gave appellant a ride to a motel because she and Lewis had fought and he had thrown all of her possessions, including her dog, out of his house. According to Jenkins, Lewis had said that he never wanted appellant around his house again after that day, and appellant had said that she was going to drive to California.

But "[e]ach fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts [is] sufficient to support the conviction under the law of parties." *Gross*, 380 S.W.3d at 186. Rejecting the jury's decision and sustaining appellant's first issue would require substituting inferences in appellant's favor for the reasonable, implicit inferences that the jury drew against her. We cannot do so because the trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Winfrey*, 393 S.W.3d at 768. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*,

19

330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Temple*, 390 S.W.3d at 360.

For all of these reasons, viewing the evidence in the light most favorable to the verdict and deferring to the jury's resolution of conflicting inferences from the evidence, we conclude that a rational jury could have found the existence of appellant's participation in a conspiracy to rob Sabin beyond a reasonable doubt, which is the only essential element of her murder conviction that she challenges. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Winfrey*, 393 S.W.3d at 768; *see also* Tex. Penal Code Ann. §§ 7.02(b), 15.02(a), 19.02(b)(3). We overrule appellant's first issue.

**Denial of Motion to Suppress**

In her second issue, appellant contends that the trial court erred by denying her motion to suppress the first two hours and fourteen minutes of her recorded interview with Ranger Wright. We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221

20

S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005). We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007).

Ranger Wright was the only witness at the suppression hearing. Appellant does not contest his credibility or the truth of the facts in his testimony at that hearing. Rather, the parties present different arguments concerning the legal significance of those facts. Thus, we will apply a de novo review. *See Amador*, 221 S.W.3d at 673.

Appellant contends that her recorded statement was inadmissible because it was "not taken in compliance" with *Miranda* or article 38.22 of the code of criminal procedure. *Miranda* and article 38.22 require that when a defendant is questioned while in custody, law enforcement must advise the defendant of certain rights, including the right to remain silent and to have a lawyer present during questioning. *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2(a), 3(a)(2) (West Supp. 2013); *Miranda*, 384 U.S. at 478–79, 86 S. Ct. at 1630; *see also Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) ("As with the *Miranda* warnings, the warnings in . . . Article 38.22 are required only when there is custodial interrogation."). The State argues that the warnings associated with *Miranda* and article 38.22 were not required because appellant was not in custody during the first part of the interview. We agree with the State.

When raising a claim under *Miranda* or article 38.22, the defendant bears the initial burden of proving that he or she was in custody. *Hines v. State*, 383 S.W.3d 615, 621 (Tex. App.—San Antonio 2012, pet. ref'd). In deciding whether a person was in custody, we must consider whether, given the circumstances surrounding the interrogation, a reasonable person would have perceived that law enforcement officers restrained the person's movement in a way that is comparable to the restraint of a formal arrest. *See Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995); *Dees v. State*, Nos. 02-12-00488-CR, 02-12-00489-CR, 2013 WL 6869865, at *3 (Tex. App.—Fort Worth Dec. 27, 2013, no pet.) (mem. op., not designated for publication). In other words, we must determine whether a reasonable person would have felt free to end the interrogation and leave. *See Thompson*, 516 U.S. at 112, 116 S. Ct. at 465; *Nguyen v. State*, 292 S.W.3d 671, 678 (Tex. Crim. App. 2009).

As the court of criminal appeals has stated,

> In evaluating whether a reasonable person would believe his freedom has been restrained to the degree of formal arrest, [courts look] only to the objective factors surrounding the detention. The subjective beliefs of the detaining officer are not included in the calculation of whether a suspect is in custody. But if the officer manifests his belief to the detainee that he is a suspect, then that officer's subjective belief becomes relevant to the determination of whether a reasonable person in the detainee's position would believe he is in custody. Conversely, any undisclosed subjective belief of the suspect that he is guilty of an offense should not be taken into consideration—the reasonable person standard presupposes an "innocent person."

22

*State v. Ortiz,* 382 S.W.3d 367, 372–73 (Tex. Crim. App. 2012) (footnotes omitted). Custody determinations must be made on a case-by-case basis while considering all objective circumstances, but four nonexclusive categories that may constitute custody for purposes of *Miranda* and article 38.22 are

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted,[16] and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Id.* at 376–77 (quoting *Dowthitt*, 931 S.W.2d at 255). For the fourth of these categories to constitute custody, the officer's belief that probable cause to arrest exists must be "manifested to the suspect." *Id.* at 376 (quoting *Dowthitt*, 931 S.W.2d at 254).

A person is generally not in custody when the person "voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated in committing the crime." *Burgess*, 2014 WL 70090, at *9 (quoting *Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex. Crim. App.), *cert. denied*, 484 U.S. 975 (1987)); *see Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987) ("Once the circumstances show

---

[16]"In the first three situations, the restriction on freedom of movement must amount to a degree associated with arrest rather than investigative detention." *Burgess v. State*, No. 02-12-00407-CR, 2014 WL 70090, at *7 (Tex. App.—Fort Worth Jan. 9, 2014, no pet. h.) (mem. op., not designated for publication).

that the person is acting upon the invitation, urging[,] or request of police officers, and not the result of force, coercion[,] or threat, the act is voluntary and the person is not then in custody."), *cert. denied*, 487 U.S. 1210 (1988); *Varela v. State*, No. 04-13-00303-CR, 2014 WL 1494607, at *4 (Tex. App.—San Antonio Apr. 16, 2014, no pet.) (mem. op., not designated for publication) (holding similarly). Several precedential decisions demonstrate this principle.

For example, in *Oregon v. Mathiason*, the Supreme Court held that a defendant was not in custody when an officer asked the defendant to meet at a police building two blocks from the defendant's apartment, the defendant went to the building and talked to the officer in a closed office, and the officer told the defendant that he was not under arrest but stated that the police suspected his involvement in a burglary. 429 U.S. 492, 493–95, 97 S. Ct. 711, 713–14 (1977).

Next, in *White v. State*, we held, citing *Mathiason*, that a defendant was not in custody when the police approached him in a park, told him that they wanted to speak with him about a stolen cell phone, said that he was not under arrest, allowed him to call his grandmother, asked him whether he needed to eat or drink, took him to a police station for a one-hour interview, and took him to his grandmother's house after the interview concluded. 395 S.W.3d 828, 831–32, 835–37 (Tex. App.—Fort Worth 2013, no pet.)

And in *Estrada v. State*, the court of criminal appeals held that a defendant was not in custody when the police, who were investigating a capital murder, told the defendant that he did not have to talk and that he was not under arrest, took

24

him to a police station for a five-hour interview, and told him several times that he was free to leave. 313 S.W.3d 274, 292–95 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905 (2011); *see also Ervin v. State*, 333 S.W.3d 187, 208, 212 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (holding that a defendant was not in custody although she stayed at a police station for four hours while being interrogated), *cert. denied*, 131 S. Ct. 2992 (2011); *State v. Rodriguez*, 986 S.W.2d 326, 330 (Tex. App.—El Paso 1999, pet. ref'd) (determining that a defendant was not in custody although an interrogation lasted several hours).

At the beginning of appellant's interview with Ranger Wright, near 10 p.m. on the day after the murder, he expressed that he wanted to make it "crystal clear" that she was not under arrest, that he did not plan to arrest her, and that she did not have to talk to him. He also stated that he had explained these facts to her before the interview had started. He asked her whether she needed any food or water.

At the suppression hearing, Ranger Wright testified that he did not tell appellant that she was under arrest, that he had a warrant for her arrest, or that she would be arrested if she did not comply. He explained that in the front seat of his truck and without wearing handcuffs, appellant went with him to the state police office, which was less than two miles away from the hotel. They went into an interview room. During the interview, which lasted approximately four hours, appellant used her cell phone several times for phone calls and text messages.

25

At the end of the interview, she called her father and told him that she was not being detained, and Ranger Wright took her back to her hotel.

Under the cases cited above, we agree with the trial court's finding that appellant was not in custody in the first part of Ranger Wright's interview with her. These undisputed facts show that appellant voluntarily and without force, threats, or restraints, acted upon Ranger Wright's invitation and accompanied him to the state police office; that he told her more than once that she was not under arrest and was not required to talk to him; that the interview lasted for four hours, which, under the cases above, does not by itself mean that appellant was in custody; and that he drove her back to the hotel after the interview concluded. As the State contends, there is no evidence that appellant was personally searched, fingerprinted, handcuffed, or photographed. Although appellant emphasizes that she was already a suspect when she agreed to speak with Ranger Wright, the record does not establish that Ranger Wright communicated such a status to her in the first part of the interview, and "being the focus of the investigation does not equate to custody."[17] *Cedillos v. State*, 250 S.W.3d 145, 152 (Tex. App.—Eastland 2008, no pet.) (citing *Meek v. State*, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990)); *see also Estrada*, 313 S.W.3d at 294 (explaining that an officer's "beliefs concerning the potential culpability of the individual being questioned . . . may be one among many factors that bear upon the assessment

_____

[17]During his testimony in front of the jury, Ranger Wright said that when he was sent to talk with appellant, he was not sure that she would be arrested.

whether that individual was in custody, but only if the officer's . . . beliefs were somehow manifested to the individual under interrogation"). Also, appellant argues that she was in custody because at night, she was "isolated" at the police office away from her hotel. We cannot agree. *See Estrada*, 313 S.W.3d at 289, 292, 294–95 (holding that a defendant was not in custody when after 8 p.m., he rode with the police from his apartment to a police station for an interview that lasted several hours).

We uphold the trial court's finding that appellant was not in custody during the first part of her interview with Ranger Wright, and we overrule her argument that the recording was inadmissible under *Miranda* or article 38.22. *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2(a), 3(a)(2); *Miranda*, 384 U.S. at 478–79, 86 S. Ct. at 1630. We overrule appellant's second issue.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment of conviction.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and MCCOY, JJ.

GARDNER, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 10, 2014

27