**Opinion issued July 31, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

NO. 01-12-00956-CR
NO. 01-12-00958-CR
NO. 01-12-00964-CR
NO. 01-12-00965-CR

———————————

**KIMBERLEY LOUISE SHANO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 10CR2028, 10CR2358, 10CR2359, and 10CR2361[1]**

---

## MEMORANDUM OPINION

---

[1] Appellate cause number 01-12-00956-CR; trial court case number 10CR2359. Appellate cause number 01-12-00958-CR; trial court case number 10CR2028. Appellate cause number 01-12-00964-CR; trial court cause number 10CR2358. Appellate cause number 01-12-00965-CR; trial court cause number 10CR2361.

A jury found appellant, Kimberly Shano, guilty of intoxication manslaughter,[2] two separate offenses of accident involving personal injury or death,[3] and aggravated assault with a deadly weapon.[4] The jury assessed her punishment at confinement for twenty years for intoxication manslaughter, ten years for each offense of accident involving personal injury or death, and fifteen years for aggravated assault with a deadly weapon. In three issues, appellant contends that the evidence is legally insufficient to support her convictions and the trial court erred in denying her motions to suppress her statements and for a new trial.

We affirm.

### Background

The surviving complainant testified that on July 7, 2010, she, who was twelve years old, and her brother, who was fifteen years old, went to their grandmother's home to help her clean her house and take care of her dogs. They left their grandmother's home to walk to a friend's house, which was five blocks away. She explained that they did not make it there, and she had only a "foggy" memory of a police officer later asking her for her address before awaking in a

---

[2]    *See* TEX. PENAL CODE ANN. § 49.08(a) (Vernon 2011).

[3]    *See* TEX. TRANSP. CODE ANN. § 550.021 (Vernon Supp. 2013), § 550.023 (Vernon 2011).

[4]    *See* TEX. PENAL CODE ANN. § 22.01 (Vernon Supp. 2013), § 22.02 (Vernon 2011).

hospital. When she awoke, she found that her brother had been killed after a car had hit them while they were walking. She learned that she had sustained a concussion and injuries to her right arm, right hand, forehead, and the back of her left leg. And she noted that her eyesight is not as good as it was before the collision.

James Klenk testified that on July 7, 2010, while talking on his cellular telephone outside the store where he worked on Bayshore Drive, he saw the surviving complainant and her brother walking on the other side of the street, along the shoulder "in the grass." He noted that they started running, and then he heard "squealing" tires and saw a gold car hit the children. The car went halfway into "the ditch" before swerving back onto the road without stopping. Klenk explained that the passenger side of the car struck the surviving complainant, throwing her into the air, while the front end hit her brother, who "went up over the car," hitting the windshield. Klenk telephoned for emergency assistance, and he ran across the street to help. The surviving complainant was awake, but "having trouble," and her brother was unconscious, lying face down in the ditch. Klenk held the boy's face up out of the water in the ditch. Although Klenk saw that there were two people in the car, he did not see who was driving.

Francesca Villarreal testified that on July 7, 2010, when she and her husband were driving home on Bayshore Drive, they saw the gold compact car that was

3

driving in front of them veer off the road to the right, hit something, and then swerve back onto the road without braking or stopping. When the Villarreals pulled up to where the car had left the road, they saw two bodies lying in the ditch, and they stopped and jumped out of their truck to assist. Villarreal did not see who was driving the gold car or how many people were in it.

Jaime Palco testified that on July 7, 2010, he, his wife, Mary Beth Palco, and their children were driving home and had to detour around an accident on Bayshore Drive. A few blocks away, Palco noticed the smashed windshield of a car that was "moving really fast" and stopped "suddenly" when it and Palco's car stopped at a stop sign. As the other car continued on, he noted that the car swerved into another lane and almost hit a fire hydrant. At some point, the other car stopped, and Palco got out of his car to ask the people in the other car if they needed help. He explained that the driver of the car had straight, black hair and the passenger had dark brown, wavy hair. The driver of the other car then sped away, and the Palcos drove around to try to find the car. When the Palcos saw the same car parked in a driveway by a trailer home, Mary Beth called for emergency assistance and reported the address of the trailer home where they found the car, which, she testified, was a gold Toyota Camry. During a subsequent interview with a police officer, Palco noted that the driver of the gold car was wearing a black shirt, and he later identified appellant as the driver.

4

Galveston County Sheriff's Office ("GCSO") Sergeant G. Hayes testified that on July 7, 2010, he was asked to act as the reconstructionist of the auto-pedestrian collision that occurred on Bayshore Drive. A dispatcher then notified Hayes that witnesses had reported driving behind a car that might have been involved in the collision. When Hayes arrived at the trailer home, he saw the reported gold Toyota Camry parked in the driveway, saw damage to the car, and noticed hair embedded in its windshield. When he went to the door of the trailer home, he found Jason and Tabitha Ross, the owners, who both told Hayes, "without hesitation," that the driver of the Camry was in the back of the home. Hayes found appellant in the bathroom, "bent over," and facing the opposite direction. Appellant did not respond to Hayes until he put his hands on her back, and she then appeared "dazed" and "confused." Hayes instructed appellant to turn around, and he put handcuffs on her to take her back to the collision scene, where a criminal investigation was still ongoing. Hayes explained that he had to support appellant as they walked through the trailer home because she appeared to be impaired and stumbled and almost fell. Hayes noted that although he did not say anything to appellant, as they walked out the front door of the home, she asked Hayes, "[H]ow the people were"?

After Sergeant Hayes placed appellant into his patrol car, he told her that he was detaining her because she had been operating a car that was suspected of

having been involved in a hit-and-run collision. After appellant told Hayes that she was not the driver of the car at the time of the collision and Tabitha Ross was the driver, Hayes told Ross that she would also be detained. Hayes noted that later in the evening, when Hayes interviewed Ross, she appeared "very much" to be intoxicated or impaired. From his investigation and all of the information that he received, Hayes opined that appellant was the driver of the car at the time it collided with the surviving complainant and her brother. He further noted that no other person was at the trailer home or outside the home while he was there.

GCSO Deputy J. Manuel testified that on July 7, 2010, he was dispatched to the collision scene on Bayshore Drive. When Sergeant Hayes came to the scene with appellant, he told Manuel that he "possibly" had the driver of the car and suspected that she was intoxicated, but not with alcohol. Manuel went to Hayes's patrol car, removed appellant's handcuffs, and took her to the area near his patrol car, where he asked her if she had consumed any alcohol that day. After appellant told him that she had previously taken two Xanax tablets for anxiety, he explained that he would administer field sobriety tests to her. During the field sobriety tests, appellant asked Manuel, "Are the kids okay?" After administering the tests, Manuel asked appellant additional questions about when she had taken the Xanax tablets, whether she had taken any other drugs, and where she and Tabitha Ross had been before the collision. Appellant explained that after she and Ross had

6

gone to a store, they "switched" positions in the car because Ross could not drive. After Manuel asked appellant who was the driver of the car at the time of the collision, she responded that she was the driver. Appellant also told Manuel that she had not consumed any alcohol or other intoxicant in the time between the collision and the time that Hayes detained her at the Rosses' trailer home.

After administering the field sobriety tests to appellant, Deputy Manuel concluded that she was intoxicated, and he placed her under arrest. Manuel explained that he then took appellant to a hospital to have her blood tested, and, on the way, she again asked about the two children and stated that the children "weren't in the grass. They were on the road. That's why I jerked." The blood test results revealed that appellant had the drugs Alprazolam, Clonazepam, Hydrocodone, Carisoprodol, and Meprobamate in her system.

Tabitha Ross testified about her prior felony convictions and that although she had criminal charges pending against her, the State did not offer her any "deals" in exchange for her testimony against appellant. Ross explained that in July 2010, appellant stayed with the Rosses at their trailer home for several days. On the morning of July 7, 2010, Ross and appellant smoked a marijuana cigarette and took a drug called "Somas." At lunchtime, Ross took Klonopin, Vicodin, and more Somas. That afternoon, she and appellant drove the gold Camry to pick up her husband, Jason Ross, from work. Afterward, the Rosses drove appellant to

7

meet someone, and they later picked her up and went to the Rosses' home, where Ross took "a few more" Somas and two Xanax tablets that appellant had given her. After discussing what to have for dinner, Ross drove appellant to a convenience store, where Ross bought a cup of soup. Appellant wanted food from a Jack-In-The-Box restaurant, but Ross stated that she could not drive because of the effect of the drugs she had taken. Appellant then drove the car. As appellant drove the car down Bayshore Drive, Ross bent down to look for her cellular telephone in her purse that was on the floor. She then felt the car hit something. Ross looked up, but could not see anything through her side of the windshield because it was badly damaged. Ross said, "Oh, my God. What did you hit?" Appellant then said something like, "No one saw us. It was mailboxes. And I just went in the grass. It was mailboxes." Ross asked appellant to stop the car, but appellant kept driving. Ross then told appellant to take her home to her husband because he would know what to do. Ross explained that she remembered that a white car was trying to follow them and appellant almost hit it. When they returned to the Rosses' trailer home, Ross told her husband that appellant had hit something with the car, but she did not know what they had hit because she did not see it. Appellant said that she would pay for the damage. Appellant went inside the home and into the bathroom, where she took some pills. When Sergeant Hayes arrived at the trailer home and asked for the driver of the car, Ross told him that appellant was inside in the

8

bathroom.  Hayes took Ross in handcuffs back to the collision scene and to a GCSO station to be interviewed.  Ross explained that appellant had not driven the car before the day of the collision.

Jason Ross testified that he is married to Tabitha Ross, but they were separated at the time of trial.  He explained that he had prior felony convictions and although a charge of child abandonment was then pending against him in Galveston County, the State had not offered him anything in exchange for his testimony and he did not expect any leniency for his testimony.  Ross stated that on July 7, 2010, Tabitha Ross drove the gold Camry to pick him up from work and appellant was with her.  After they arrived, he drove them back to the trailer home.  His wife and appellant then left to go to a store.  When the two women returned, Ross could see that the car, which had been in perfect condition before, was "wrecked."  He saw hair and blood on the car's hood and stuck in the windshield.  He stated that appellant was in the driver's seat and his wife was in the passenger's seat.  As appellant ran inside the home, Tabitha told him that while she was eating her soup in the car, she realized that appellant had hit something, but she did not know what appellant had hit, although she thought appellant had hit some mailboxes. Immediately afterward, Sergeant Hayes arrived and asked for the driver of the car, and Ross told him that she was inside the trailer home.  Ross could tell

9

that both women were "tripping on something" and "under the influence," and he noted that his wife has a "drug problem" and "eats a lot of pills."

Dr. Sean Wenngroff testified that he is an obstetrician and on July 28, 2010, a few weeks after the collision, he saw appellant for a routine prenatal visit. Wenngroff explained that, during the visit, appellant told him that she was the driver of a car that had hit two children by a road and she was not wearing a seatbelt at the time. Appellant also told Wenngroff that "the kids fell in a ditch" and she "kept going."

Dr. Victor Scarano, a psychiatrist, testified that he performed a mental-competency evaluation on appellant. He noted that the first time that he met with appellant, she did not remember what happened on July 7, 2010, but told him that she had taken Xanax, Klonopin, Vicodin, and Soma before the collision. Scarano diagnosed appellant with poly-substance abuse and dependence, and he opined that her mental-health issues developed after and because of her drug abuse. Although appellant's medical records revealed that she previously had been diagnosed with schizophrenia, having delusions, and bipolar disorder, her substance-abuse disorder pre-dated the psychiatric diagnoses. Scarano explained that drug abusers can exhibit symptoms of schizophrenia or bipolar disorder, but not actually have such disorders. And he opined that appellant's drug abuse and voluntary intoxication were related to the collision and any diagnosis of schizophrenia or bipolar disorder

10

was unrelated. Scarano further explained that some individuals with schizophrenia or bipolar disorder are susceptible to suggestions that something happened that may not have actually happened, and, at the time of the collision, appellant had some risk factors that would be present in someone who could confess under a delusion. Although it was possible that appellant falsely confessed, Scarano's opinion, to a reasonable degree of medical certainty, was that the factors that go into making a false confession were not present in her case.

Maria Shehu testified that she lives in a house next door to the Rosses' trailer home and, sometime during the summer of 2010, she was sitting on her porch when she saw a gold Toyota Camry speeding as it made the turn into the Rosses' driveway. Shehu explained that she saw Tabitha Ross get out from driver's side of the car, and she heard her say excitedly, "Oh, God. I don't do nothing wrong, but the police is going to take me. And who is going to take care of my babies?" And twenty or thirty minutes later, she saw a police officer arrive at the Rosses' home.

April Jones testified that on July 7, 2010, she was babysitting at the Rosses' trailer home while Tabitha Ross went to pick up her husband from work. Later, Ross and appellant left again to get food and "score some pills," so Jones stayed to watch the children. Jones later heard the Rosses' car pull into the driveway, and she stepped outside. Jones then saw appellant get out of the passenger side of the

11

car and Ross jump out of the driver's side of the car and run into the house. She was acting "hysterical" and "crazy," saying, "Oh, my God. I think we hit mailboxes." And, "I can't go to jail. No one is going to take care of my kids."

## Sufficiency of the Evidence

In her third issue, appellant argues that the evidence is legally insufficient to support her conviction because "the evidence conclusively establishes a reasonable doubt." Appellant asserts that the "[e]vidence tending to show [appellant] was the driver [of the Camry at the time of the collision] is unreliable, based on witnesses' poor memory, and biased." She asserts, by contrast, the evidence showing that she "was the passenger was corroborated by multiple witnesses."

We review the legal sufficiency of the evidence by considering all of the evidence "in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S. W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim.

App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given the witness's testimony. *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). And they may choose to believe or disbelieve any part of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). "Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).

A person commits the offense of intoxication manslaughter if the person: (1) "operates a motor vehicle in a public place"; (2) "is intoxicated"; and (3) "by reason of that intoxication causes the death of another by accident or mistake." TEX. PENAL CODE ANN. § 49.08(a) (Vernon 2011).

A person commits the offense of accident involving personal injury or death if she fails to comply with the requirements that she stop and render assistance if she is (1) a driver of a vehicle, (2) involved in an accident, (3) resulting in personal injury or death of any person, and (4) intentionally and knowingly, (5) fails to stop and render reasonable assistance. TEX. TRANSP. CODE ANN. § 550.021 (Vernon Supp. 2013), § 550.023 (Vernon 2011); *Goar v. State*, 68 S.W.3d 269, 272 (Tex.

13

App.—Houston [14th Dist.] 2002, pet. ref'd). Circumstantial evidence is sufficient evidence to prosecute for failure to stop and render assistance. *See Clausen v. State*, 682 S.W.2d 328, 332 (Tex. App.—Houston [1st Dist.] 1984, pet. ref'd).

A person commits aggravated assault with a deadly weapon if she (1) "intentionally, knowingly, or recklessly causes bodily injury to another" and (2) "uses or exhibits a deadly weapon during the commission of the assault." TEX. PENAL CODE ANN. § 22.01(a)(1) (Vernon Supp. 2013), § 22.02(a)(2) (Vernon 2011). "'Bodily injury' means physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (Vernon Supp. 2013). A "deadly weapon" is "(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* at § 1.07(a)(17).

The jury heard evidence that appellant was the driver of the car that hit and injured the surviving complainant and hit and killed her brother. Jason Ross testified that when Tabitha Ross and appellant returned from driving to the convenience store, appellant got out of the Camry from the driver's seat and his wife got out of Camry from the passenger seat. Tabitha testified that when she and appellant left the convenience store, appellant drove the car because Tabitha was

too "intoxicated" to drive. She explained that appellant was driving the car when appellant caused the car to hit the surviving complainant and her brother.

Jaime Palco testified that he was able to see the driver of the gold Toyota Camry when the Camry stopped on the street, only a few blocks from the collision, and Palco exited his car to see if anyone in the Camry needed help. He identified the driver as appellant. Further, Palco and his wife both testified that the driver of the Camry had straight, dark hair, which matched appellant, and the passenger had wavy hair, which matched Tabitha Ross.

The jury also heard Dr. Wenngroff testify that during a routine prenatal examination only a few weeks after the collision, appellant told him that she had been driving a car that hit two children and she was not wearing her seatbelt at the time. Wenngroff also testified that appellant told him that "the kids fell in a ditch" and she "kept going."

Moreover, appellant told Deputy Manuel that she was the driver of the car at the time of the collision because she and Tabitha Ross had "switched" at the convenience store, as Ross could not drive. In the patrol car after she had been placed under arrest, appellant told Manuel that the children "weren't in the grass. They were on the road. That's why I jerked." Appellant asserts that her own "incriminating" statements that she was the driver of the Camry must be "put in the context of her mental illness." However, the State offered the testimony of Dr.

Scarano, who opined that the correct diagnosis for appellant was poly-substance abuse, which pre-dated and caused any symptoms of mental illness that appellant exhibited. The jury also heard Scarano opine that the "factors that go into the making of false confessions were not present in this case."

The State's evidence that appellant was the driver of the Camry at the time of the collision was contradicted only by the testimony of April Jones and Maria Shehu. They each testified that, when the Camry pull into the Rosses' trailer home driveway, they saw Tabitha Ross get out of the driver's side and heard her exclaim excitedly that she could not go to jail because no one would take care of her children. However, Sergeant Hayes testified that he did not see anyone other than the Rosses or appellant inside or outside the Rosses' trailer home while he was there.

Viewing the evidence in the light most favorable to the jury's verdict, as we must, we conclude that a rational trier of fact could have reasonably found that appellant committed the offenses of intoxication manslaughter, accident involving serious personal injury or death, and aggravated assault with a deadly weapon. Accordingly, we hold that the evidence is legally sufficient to support appellant's convictions of these offenses.

We overrule appellant's third issue.

16

## Motion to Suppress Statements

In her second issue, appellant argues that the trial court erred in denying her motion to suppress the statements that she made to Deputy Manuel because her detention was not temporary, but an arrest to which "her privilege against self-incrimination applies." The State asserts that appellant was temporarily detained for an investigation and the detention did not become a custodial interrogation.

We review a ruling on a motion to suppress a defendant's statement for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, the trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When the trial court makes findings of fact with its ruling on a motion to suppress, an appellate court does not engage in its own factual review, but determines only whether the record supports the trial court's fact findings. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App.

1990). Unless the trial court abuses its discretion in making a finding not supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

The State may not use statements that have been obtained through "custodial interrogation" of an individual unless it has used procedural safeguards to secure the Fifth Amendment privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). And the Texas Code of Criminal Procedure precludes the State's use of statements from custodial interrogation without compliance with these and additional procedural safeguards. TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon Supp. 2013).

The appropriate inquiry as to whether a person is "in custody," for purposes of their right to receive legal warnings is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977)); *see also Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009). A "custodial interrogation" is questioning that is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of her freedom in any significant way. *See Herrera v. State,* 241 S.W.3d 520, 525 (Tex. Crim. App.

18

2007). If the individual is not yet in custody and the investigation is not yet at the custodial stage, the individual's Fifth Amendment rights have not yet come into play. *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990); *White v. State*, 395 S.W.3d 828, 834 (Tex. App.—Fort Worth 2013, no pet.).

The court of criminal appeals has discussed four general situations that may constitute custody for purposes of *Miranda* and article 38.22: (1) the person is physically deprived of her freedom of action in any significant way; (2) a police officer tells the person she is not free to leave; (3) police officers create a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the person, and police officers do not tell the person that she is free to leave. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). In the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest rather than an investigative detention. *Id.* Under the fourth situation, the law enforcement officer's knowledge of probable cause must be manifested to the suspect. *Id.* This manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. *Id.* Because probable cause is merely a factor, the occurrence of situation four does not automatically establish custody. *Id.* Custody will only then be established if the manifestation of probable cause, combined with

19

other circumstances, would lead a reasonable person to believe that she is under restraint to the degree associated with an arrest. *Id.* Simply because an interrogation begins as "noncustodial" does not preclude custody from arising later if police conduct causes "a consensual inquiry to escalate into [a] custodial interrogation." *Id.* The defendant bears the burden at trial of proving that her statements were the product of a custodial interrogation. *Herrera*, 241 S.W.3d at 526.

### *Non-Custodial Investigative Detention*

Under the first and third situations discussed in *Dowthitt*, an investigative detention can evolve into custody if police officers physically deprive a person of significant freedom of movement, or create a situation in which a reasonable person would believe that she is deprived of significant freedom of movement. *Dowthitt*, 931 S.W.2d at 255. To constitute custody in such a situation, the restriction upon the individual's freedom of movement must be to the degree associated with an arrest as opposed to an investigative detention. Although both an investigative detention and an arrest involve a "restraint of liberty," a non-custodial investigative detention does not implicate a person's Fifth Amendment rights against self-incrimination. *See Melton*, 790 S.W.2d at 326; *Mount v. State*, 217 S.W.3d 716, 724 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Whether a person is under arrest or merely subject to a temporary investigative detention is a matter of degree and depends upon the length of the detention; the amount of force employed by officers; whether the officers actually conduct an investigation and whether it is conducted at the original location or whether the individual is transported to another location; the officer's expressed intent and whether he told the person that she was under arrest or being detained for a temporary investigation; and other relevant factors. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008). Appellant argues that because she was handcuffed, placed in the back of a patrol car, and taken to the scene of the collision, the deprivation of her freedom of movement was significant and a reasonable person would so believe.

Here, Sergeant Hayes found appellant at a location away from the collision scene because she did not stop after hitting the surviving complainant and her brother. Hayes went to the Rosses' trailer home after witnesses had reported seeing a damaged car suspected of having been involved in the collision and had located it at the Rosses' home. Hayes found appellant in the bathroom of the Rosses' home, and he placed her in handcuffs to transport her back to the collision scene, where the investigation was ongoing. After Hayes placed appellant into his patrol car, he told her that she was being detained because she had been operating a car that was suspected of having been involved in a hit-and-run accident. When

appellant told Hayes that she was not the driver of the car, but Tabitha Ross was the driver, Hayes asked another officer to transport Ross back to the collision scene as well.

Deputy Manuel testified that when Sergeant Hayes brought appellant to him at the collision scene, Hayes told him that he "possibly" had the driver. Manuel then removed the handcuffs from appellant, and he allowed to her carry her purse over to an area by his patrol car. Manuel explained that appellant was not in custody during the time that he administered field sobriety tests to her and he did not have probable cause to arrest her until after she had failed the tests. Moreover, Hayes testified that James Klenk made the initial telephone call for emergency assistance after the collision at 7:27 p.m., and the Palcos call, informing officers of the location of the car suspected of being involved in the collision, was made ten minutes later at 7:37 p.m. Manuel arrested appellant at 9:09 p.m., making her detention less than an hour and a half from the time she was transported from the Rosses' trailer home to the time she was arrested.

Appellant asserts that the use of handcuffs on her did not serve the goals of the investigation or maintenance of the status quo, and they were unnecessary for officer safety. However, Sergeant Hayes's use of handcuffs on appellant did not automatically convert the temporary detention into a formal arrest. *See Sheppard*, 271 S.W.3d at 289. Hayes testified that because he was the only officer at the

Rosses' trailer home, he was concerned about "seeking control" and "officer safety." And a videotape from Deputy Manuel's patrol car shows that the handcuffs had been removed and appellant was allowed to carry her purse from Hayes's patrol car to an area near Manuel's patrol car before he administered the field sobriety tests to her.

Given the totality of the circumstances, "a reasonable person would believe the seizure was . . . sufficiently nonintrusive as to be only an investigatory detention." *Id.* at 291. Based on these facts, Sergeant Hayes's and Deputy Manuel's restrictions on appellant's freedom were consistent with an investigative detention and did not rise to the degree associated with an arrest. The trial court could have reasonably concluded that appellant was not in custody under the first or third situations discussed in *Dowthitt*.

### Probable Cause

Appellant further argues that the trial court erred in denying her motion to suppress her statements to Deputy Manuel because "the trial court had already been made aware" that she "was so impaired she could not walk." And because Sergeant Hayes and Manuel had probable cause to arrest her and did not inform her that she was free to leave, the fourth situation discussed in *Dowthitt*, implicating, custody applies. Appellant does not assert that Hayes or Manuel told her that they had probable cause to arrest her.

23

Sergeant Hayes testified that because he had received additional information from GCSO dispatch relating to the identity of the driver of the car involved in the collision, he suspected that appellant was the driver. He told Deputy Manuel that he "possibly" had the driver and suspected that she was intoxicated, although not with alcohol. However, Manuel testified that before arresting appellant, he needed to investigate further. He explained that as he conducted his investigation and administered the field sobriety tests to appellant, he asked her standard questions so that he could determine whether she was the driver of the car since it would only be important to conduct the tests on the actual driver of the car. The administration of the field sobriety tests was a logical part of Manuel's investigation. Even if Manuel had probable cause to arrest appellant before administering the field sobriety tests, he did not convey that to appellant. And while the manifestation of probable cause may trigger a finding of custody in "certain unusual situations," those conditions are not present in this case. *See State v. Stevenson*, 958 S.W.2d 824, 829 n. 7 (Tex. Crim. App. 1997); *see also Dowthitt*, 931 S.W.2d at 255–57 (holding probable cause triggered finding of custody after very long interrogation where suspect was never unaccompanied and officers ignored requests to see his wife). Moreover, probable cause concerns only one of the situations discussed in *Dowthitt*, and its existence alone does not establish custody.

Considering the totality of the circumstances and giving due deference to the trial court's determination of historical facts, the trial court could have reasonably concluded that Sergeant Hayes's and Deputy Manuel's actions under these circumstances did not constitute a manifestation of probable cause and appellant was not "in custody" under the fourth situation discussed in *Dowthitt*. *See Dowthitt*, 931 S.W.2d at 255. The trial court could have reasonably concluded that a reasonable person in appellant's position would not think she was under arrest. Therefore, appellant's statements were not the product of a custodial interrogation and her legal rights under *Miranda* and article 38.22 were not triggered. *See Melton*, 790 S.W.2d at 326; *White*, 395 S.W.3d at 834. Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress her statements to Deputy Manuel on the ground that she was in custody and not informed of her legal rights.

We overrule appellant's second issue.

## Motion for New Trial

In her first issue, appellant argues that the trial court erred in denying her motion for new trial because there was "newly discovered evidence concerning a deal between the Rosses and the prosecutors" and, without having this impeachment evidence, she was denied a fair trial.

25

A trial court has discretion in deciding whether to grant a new trial based upon the discovery of new evidence, and its ruling is reviewed for an abuse of discretion. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). The trial court determines the credibility of the witnesses and whether the new evidence is probably true. *Id.* The court of criminal appeals has described the "probably true" requirement as "the whole record presents no good cause to doubt the credibility of the witness whose testimony constitutes the new evidence, either by reason of the facts proven at the trial or by the controverting affidavits on the motion, or otherwise." *Id.* at 38.

In a criminal case in Texas, "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." Tex. Code Crim. Proc. Ann. art. 40.001 (Vernon 2006). The court of criminal appeals has developed a four-part test for courts to use in deciding motions for new trial under article 40.001: whether (1) the newly discovered evidence was unknown or unavailable to the movant at the time of her trial; (2) the movant's failure to discover or obtain the evidence was not due to a lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result on another trial. *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003).

26

The State argues that appellant's motion for new trial was fatally defective because she did not attach a sworn verification of the allegations in the motion or affidavits from witnesses who could testify concerning the newly discovered evidence. Appellant argues that certified copies of criminal charges brought against the Rosses and orders subsequently dismissing those charges "should have been considered sufficient averment of fact or verification so as to not make her Motion for a New Trial a general indefinite motion."

Even if we could properly consider appellant's arguments or the attachments to her motion for new trial, her evidence does not show that she established her right to a new trial. Appellant's argument that she is entitled to a new trial is based on her assertion that she would have used this evidence to impeach the Rosses. On its face, her argument does not meet the *Wallace* test entitling her to a new trial. 106 S.W.3d at 108; *see also* TEX. CODE CRIM. PROC. ANN. art. 40.001. Although the evidence that appellant attached to her motion, purporting to show that the criminal charges against Jason and Tabitha Ross were dismissed, raises suspicions, it does not establish that she was entitled to a new trial. Accordingly, we hold that the trial court did not err in denying appellant's motion for new trial.

We overrule appellant's first issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Do not publish. TEX. R. APP. P. 47.2(b).