

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00511-CR

| | | |
|---|---|---|
| Raymond Charles White | § | From the 371st District Court |
| | § | of Tarrant County (1230480D) |
| v. | § | February 21, 2013 |
| | § | Opinion by Justice Walker |
| The State of Texas | § | (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in part of the trial court's judgment. It is ordered that the judgment of the trial court is vacated and dismissed in part and affirmed in part. We vacate and dismiss the trial court's judgment on count two and affirm the trial court's judgment on count one.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Sue Walker



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00511-CR

RAYMOND CHARLES WHITE                                    APPELLANT

V.

THE STATE OF TEXAS                                             STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Raymond Charles White appeals his convictions for burglary of a habitation with intent to commit sexual assault (count one) and burglary of a habitation with intent to commit assault (count two). In five issues, he argues that his convictions violate double jeopardy, that the trial court erred by denying his motion to suppress and his motion for mistrial, and that the trial court's charge on guilt-innocence was erroneous. We will vacate and dismiss the trial court's

2

judgment on count two as violative of double jeopardy and affirm the conviction for count one.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Claire Buckholz and her six-year-old son were asleep in her bed in her Fort Worth house one night. She awoke to the sound of strange noises around 4:30 a.m. She opened her eyes and saw a man wearing dark clothing with a hoodie pulled over his head standing in the doorway of her bedroom. She screamed. The man jumped on top of Buckholz and punched her several times. When he began choking her, she bit his finger as hard as she could. He punched her in the face again. The man told Buckholz's son to go to his room, but he would not leave his mother. The man began pulling off Buckholz's pajama bottoms, and she stopped him by telling him that she had herpes. As the man was leaving, he took Buckholz's cell phone. Buckholz and her son ran to the neighbor's house and called 911.

Fort Worth police traced Buckholz's cell phone activity to a house in southwest Fort Worth. Detective Felicia Cleveland went to that house and recovered the phone from Fernando Ruis, who said he got it from his son-in-law. The detective spoke to the son-in-law, as well as several other individuals who had possessed the phone, and ultimately traced it back to White. Police located White at a nearby park.

Detectives Cleveland and Sullivan went to the park to speak to White. They told him that they wanted to talk to him about a stolen cell phone and asked

3

if he would go with them to the police station for questioning. They saw a band-aid on White's finger. White agreed, but he asked to call his grandmother, whom he lived with, first. After calling his grandmother, White left with the detectives. They told him that he was not being arrested and that they would take him back to his grandmother's house after the interview.

During the videotaped interview, which lasted about one hour, White initially denied burglarizing Buckholz's home. He said he had cut his finger while watching a television program. White then admitted to going into Buckholz's bedroom, putting his hand over her mouth to keep her from screaming, and taking her cell phone. He also admitted that Buckholz bit him. He denied attempting to sexually assault her. The detectives took photographs of the cut on White's finger. After the interview, the police returned White to his grandmother's house. Police then obtained an arrest warrant and arrested him at the park about an hour and a half later.

Buckholz's pajama bottoms tested positive for blood. DNA testing of the blood on the pajama bottoms revealed that White was a major contributor to the mixture.

White was indicted for one count of burglary of a habitation with intent to commit sexual assault and one count of burglary of a habitation with intent to commit assault. *See* Tex. Penal Code Ann. § 30.02(a), (c)(2), (d)(2) (West 2011). The State did not introduce evidence of White's confession during its case-in-chief. After the defense called White's grandmother to testify that White

4

had been at home the night of the burglary, the State on rebuttal introduced evidence of White's confession.

A jury convicted White of both counts, and after the jury was unable to reach a unanimous verdict on punishment, the trial court granted a mistrial on punishment. After a new trial on punishment before a new jury, the jury assessed White's punishment at eighteen years' confinement on each count. The trial court sentenced him accordingly, ordering that the sentences run concurrently.

## III. DOUBLE JEOPARDY VIOLATION

In his second issue, White argues that his convictions of two counts of burglary of a habitation violated double jeopardy when only one offense of burglary of a habitation was committed. The State concedes that convicting White of two counts of burglary arising from the same act was a double jeopardy violation. *See Ex parte Cavazos*, 203 S.W.3d 333, 336–37 (Tex. Crim. App. 2006) (holding that convictions for burglary of habitation with intent to commit theft and burglary of habitation with intent to commit sexual assault for same entry violated double jeopardy because the allowable unit of prosecution was the unlawful entry). Thus, we will address the appropriate remedy, that is, which of the two offenses should be vacated and dismissed and which should be retained as the "most serious offense." *See id.* at 338.

When a defendant has been prosecuted and convicted in a single criminal action of two or more offenses that constitute the same offense, in violation of

5

double jeopardy, the remedy is to apply "the most serious offense" test and retain the conviction for the "most serious" offense. *Id.* The "most serious" offense is the offense for which the greatest sentence was assessed. *Id.* (overruling *Landers v. State*, 957 S.W.2d 558, 559–60 (Tex. Crim. App. 1997), which held that other factors—such as the degree of the felony, range of punishment, and rules governing parole eligibility and awarding of good-conduct time—should be used in that determination); *see also Evans v. State*, 299 S.W.3d 138, 141 (Tex. Crim. App. 2009); *Bigon v. State*, 252 S.W.3d 360, 372–73 (Tex. Crim. App. 2008).

But when, as here, the punishment for each conviction is identical, we cannot look to only the sentences imposed to determine the most serious offense. *See Bigon*, 252 S.W.3d at 373. In *Bigon*, faced with a situation similar to the one here, the court of criminal appeals looked at the degree of each offense in determining the most serious offense:

> Only because the sentences are identical do we have to look to another criteria for determining which offense is the most serious. In this case, we look to the degree of felony for each offense. While the sentences assessed for each of the convictions on this case is the same, felony murder is a first-degree felony, while intoxication manslaughter and manslaughter are second-degree felonies. As such, felony murder is clearly the most serious offense and we affirm the court of appeals' decision to retain this conviction.

*Id.*[1]

---

[1]Other "tie-breakers" recognized by the court of criminal appeals in conducting a "most serious offense" test when both convictions have the same imprisonment punishment include deadly-weapon findings, *see Villanueva v.*

6

White urges a percentage-of-maximum-possible-punishment approach to determining which of the two offenses is the most serious in this case. He argues that the most serious offense is the burglary of a habitation with intent to commit assault (count two) because the eighteen-year sentence assessed by the jury for that count is approximately ninety percent of the maximum twenty-year imprisonment sentence for a second-degree felony. *See* Tex. Penal Code Ann. § 12.33(a) (West 2011) (providing range of imprisonment between two and twenty years as second-degree-felony punishment). White points out that, in contrast, the eighteen-year sentence assessed by the jury for count one is only one-fifth of the maximum imprisonment sentence for burglary of a habitation with intent to commit sexual assault, a first-degree felony. *See id.* § 12.32(a) (West 2011) (providing range of imprisonment between five and ninety-nine years or life as first-degree-felony punishment). White argues that, consequently, "this jury saw the offense alleged in 'Count Two' as the more serious of the two."[2]

But following our court of criminal appeals' precedent, as we must, we will look to the degree of felony for the two offenses to determine the "most serious"

---

*State*, 227 S.W.3d 744, 749 (Tex. Crim. App. 2007), and restitution, *see Ex parte Cavazos*, 203 S.W.3d at 338. No restitution was assessed and no deadly-weapon finding was entered for either of White's convictions.

[2]White further argues that, all things being equal, he should be given the choice of remedy for this violation of his constitutional rights, but the court of criminal appeals has stated that "the 'most serious offense' test attempts to take into account which conviction *prosecutors* would choose to retain, while also continuing to meet the other policy considerations." *Bigon*, 252 S.W.3d at 373 (emphasis added).

offense. *See Bigon*, 252 S.W.3d at 373. Because burglary of a habitation with intent to commit sexual assault is a first-degree felony and burglary of a habitation with intent to commit assault is a second-degree felony, *see* Tex. Penal Code Ann. § 30.02(c)(2), (d)(2), count one—burglary with intent to commit sexual assault—is the most serious offense here. *See id.* We will vacate White's conviction for count two (burglary of a habitation with intent to commit assault). *See id.*; *see also* Tex. R. App. P. 43.2(e). We sustain White's second issue in part and, to the extent he requests we vacate his conviction for count one, overrule it in part.[3]

## IV. MOTION TO SUPPRESS

In his first issue, White complains that the trial court erred by denying his motion to suppress evidence of his confession because it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), and because the detectives' promises rendered the confession involuntary.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

---

[3]Because we set aside one of White's convictions on double jeopardy grounds, we need not address his third issue, arguing that the jury charge erroneously charged two counts of burglary, and his fourth issue, arguing ineffective assistance to the extent that his second issue was not preserved. *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to disposition of appeal).

8

In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely

9

requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

## B. *Miranda* Warnings Not Required

The State may not use a defendant's statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless the State demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. Additionally, article 38.22 of the code of criminal procedure precludes the use of statements that result from a custodial interrogation without compliance with certain procedural safeguards. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005). If an investigation is not at an accusatorial or custodial stage, a person's Fifth Amendment rights have not yet come into play, and the voluntariness in waiving those rights is not implicated. *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990).

There are at least four general situations when a suspect's detention may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect

10

that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *McCulley v. State*, 352 S.W.3d 107, 115–16 (Tex. App.—Fort Worth 2011, pet. ref'd). In the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116. Concerning the fourth situation, which is of interest in this case, the officers' knowledge of probable cause must be manifested to the subject, and such manifestation may occur if information sustaining the probable cause is related by the officers to the suspect or by the suspect to the officers. *Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116. Situation four, however, will not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116.

In this case, two detectives approached White in a park and detained him until Detectives Cleveland and Sullivan arrived about five minutes later. Detectives Cleveland and Sullivan told White that they were investigating a stolen cell phone and asked if White would go to the station with them for

11

questioning. White agreed, asking if he could call his grandmother first. The detectives allowed him to do so. They told White that he was not being arrested, that he was not in custody, and that after the interview, they would return him to his grandmother's house, which they did. He was not handcuffed.

White first argues that he was in custody for *Miranda* purposes from the moment that police traced Buckholz's phone to him and saw the band-aid on his finger at the park because a reasonable person would believe he was under arrest. But even if the detectives had probable cause to arrest White at that point, it was not manifested to him by the officers (nor by White to the officers) at that time. *See Dowthitt*, 931 S.W.2d at 255; *see also Herrera v. State*, 241 S.W.3d 520, 525–26 (Tex. Crim. App. 2007); *cf. McCulley*, 352 S.W.3d at 116. To the contrary, the detectives told him more than once that he was not under arrest, and he voluntarily consented to going to the police station for questioning. *See Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987) ("[W]here a person voluntarily accompanies investigating police officers to a certain location, and he knows or should know that the police officers suspect that he may have committed or may be implicated in committing a crime, that person is not 'restrained' or 'in custody.'"), *cert. denied*, 487 U.S. 1210 (1988); *Miller v. State*, 196 S.W.3d 256, 266 (Tex. App.—Fort Worth 2006, pet. ref'd) (reasoning that appellant's choice to voluntarily meet with police demonstrated that police encounter was initially noncustodial).

White also argues that the encounter became a custodial interrogation during the police station interview because a reasonable person would have believed he was under arrest. He relies heavily on *Xu v. State* to support his argument. *See* 100 S.W.3d 408, 414 (Tex. App.—San Antonio 2002, pet. ref'd). There, the court analyzed the following factors to determine that Xu was subject to a custodial interrogation from the moment he made a "pivotal admission" to officers about his wife's murder during a stationhouse interrogation: (1) whether the suspect arrived at the place of interrogation voluntarily—Xu voluntarily submitted to questioning, but the court stressed his distraught emotional state and the facts that he was born in China, where there are no *Miranda* rights, and that he spoke little English; (2) the length of the interrogation—Xu had been interrogated by multiple officers during separate interviews over the course of eighteen hours and had been at the police station for five hours before making his pivotal admission; (3) whether the suspect's requests to see relatives and friends are refused—Xu's friend was not allowed to speak to him at the station; (4) the degree of control exercised over the suspect—Xu had not been told that he was free to leave for approximately five hours before his pivotal admission, and he received one bottle of water and one restroom break during that time; and (5) whether a "pivotal admission" established custody—Xu made such an admission in the second interview, shortly after officers confronted him with evidence pointing to him as the suspect and said they did not believe his story. *Id.* at 414–15.

13

In this case, White voluntarily went with the police to the station for an interview. The interview lasted approximately one hour.[4] Prior to the interview, the detectives asked if White needed to use the restroom or anything to eat or drink; White did not ask for anything or to see anyone during the interview. Detective Sullivan told White that he could terminate it at any time and that the detectives would take him home. The detectives told White that he needed to tell them the truth because it would go easier on him and that they needed to know what kind of person they are dealing with. White initially said he got the cell phone from a kid at school, but approximately thirty minutes into the interview, Detective Sullivan asked if there was any reason White's DNA would be in Buckholz's house and if White would provide a DNA sample after the interview. The detectives said they knew White's story was false and that they "could prove it," but they reiterated that they would take White home no matter what he said. *See Dowthitt*, 931 S.W.2d at 255 (noting that manifestation of probable cause must, combined with other circumstances, lead a reasonable person to believe that he is under restraint to the degree associated with an arrest). Detective Sullivan then told White that police were investigating a burglary and attempted sexual assault; he asked White about the injury on his finger, saying he "[knew]

---

[4]Detective Cleveland testified that the interview lasted about an hour and a half, but she later testified that the interview started at 5:02 and ended at 5:56. The videotape reveals that the interview concluded after about one hour but that White remained in the room for another thirty minutes after the interview so that officers could photograph him and his injuries.

how that happened." White then admitted that he entered Buckholz's home to look for money, covered her mouth to prevent her from screaming, and ran out with her phone.

The detectives continued to question White, telling him that they did not think he was telling the truth about his motives or about not taking Buckholz's purse. White never admitted that he had attempted to sexually assault her or that he had taken her purse. He maintained that he had told them everything, and the detectives then ended the interview. Thus, even assuming White's "pivotal admission" turned the interview into a custodial interrogation, the continued interrogation did not reveal any additional admissions subject to suppression. *See Ruth v. State*, 645 S.W.2d 432, 436 (Tex. Crim. App. [Panel Op.] 1979) (holding that suspect's statement that he shot victim "immediately focused the investigation on him and furnished probable cause to believe that he had committed an offense"; "[a]fter that time, the continued interrogation must be considered a custodial one").

The objective circumstances surrounding White's encounter with the detectives do not show that a reasonable person in White's situation would believe that he was under restraint to the degree associated with an arrest. *See Dowthitt*, 931 S.W.2d at 255; *see also Estrada v. State*, 313 S.W.3d 274, 294–95 (Tex. Crim. App. 2010) (finding no custodial interrogation when appellant voluntarily went to police station, police told him several times that he was free to leave, and appellant said he wanted to leave several times during the five-hour

15

interrogation), *cert. denied*, 131 S. Ct. 905 (2011); *see also Oregon v. Mathiason*, 429 U.S. 492, 495–46, 97 S. Ct. 711, 714 (1977) (holding defendant not in custody for *Miranda* purposes when he went to station voluntarily upon police request, was informed that he was not under arrest, and was allowed to leave station after thirty-minute interview during which police falsely stated that his fingerprints were found at the scene). Thus, the record supports the trial court's implied findings and conclusions that White's confession was not obtained as a result of a custodial interrogation in violation of *Miranda*. *See Estrada*, 313 S.W.3d at 294–95. We overrule this portion of White's first issue.

### C. No Improper Inducement

White also argues that his confession was involuntary because the detectives made the following "promises" to him: they told him that they would return him to his grandmother's house after the interview regardless of what he told them, and they told him that he needed to tell the truth, that "it would go easier on him," and that they "needed to know what kind of person he really was."

The court of criminal appeals has held that a four-prong test must be met in order to render a confession obtained by a promise of a benefit involuntary. *Sossamon v. State*, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991), *abrogated on other grounds by Graham v. State*, 994 S.W.2d 651 (Tex. Crim. App.), *cert. denied*, 528 U.S. 974 (1999); *see also Fisher v. State*, 379 S.W.2d 900, 902 (Tex. Crim. App. 1964). The promise must be (1) of some benefit to the

16

defendant, (2) positive, (3) made or sanctioned by a person in authority, and (4) of such character as would be likely to influence the defendant to speak untruthfully. *Henderson v. State*, 962 S.W.2d 544, 564 (Tex. Crim. App. 1997), *cert. denied*, 525 U.S. 978 (1998). In our review, we look to whether the circumstances of the promise would reasonably induce a defendant to admit to a crime he did not commit. *Sossamon*, 816 S.W.2d at 345.

Here, none of the detectives' statements to White were of such an influential nature as to likely influence White to confess untruthfully. The detectives did not condition their returning White to his home upon him telling the truth; the detectives simply said they would drive White home after the interview, and they did so. *See Henderson*, 962 S.W.2d at 564; *see also Renfro v. State*, 958 S.W.2d 880, 884 (Tex. App.—Texarkana 1997, pet. ref'd) (noting that an "if-then" relationship is required to establish a promise, in other words, a conditional agreement in which a confession is exchanged for favorable treatment). And telling White that it would be "easier on him" if he told the truth was not the type of "promise" that would make White believe that his condition would be bettered by confessing, even falsely. *See Janecka v. State*, 937 S.W.2d 456, 466 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 825 (1997); *see also Herrera v. State*, 194 S.W.3d 656, 660 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (holding officer's statement that he would "talk to the District Attorney and would get an offer" was not specific enough to influence an untruthful confession). In fact, Detective Sullivan told White that he was just a gatherer of information and would

17

forward the information to the district attorney's office, which will "decide what happens."

This is not a situation in which the defendant "had nothing to lose and everything to gain whether or not his confession was truthful." *Cf. Sossamon*, 816 S.W.2d at 345 (holding defendant's confession was involuntary when he was promised immunity from prosecution for information regarding crimes in which he was involved). Viewing the record in the light most favorable to the trial court's ruling and deferring as we must to the trial court's credibility determinations, we cannot say that the trial court erred by finding that White's confession was made voluntarily. *See Wiede*, 214 S.W.3d at 24; *Kelly*, 204 S.W.3d at 818. We overrule the remainder of White's first issue.

## V. MOTION FOR MISTRIAL

In his fifth issue, White argues that the trial court abused its discretion by denying his motion for mistrial at the second punishment trial after Buckholz testified that she "knew that [White] had probably been in [her] house earlier that day." White's trial counsel objected to this testimony on extraneous offense grounds; the trial court sustained the objection and, per trial counsel's request, instructed the jury to disregard the testimony. The trial court denied trial counsel's motion for mistrial.

When the trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Hawkins v. State*, 135

18

S.W.3d 72, 76–77 (Tex. Crim. App. 2004).  A mistrial is required only in extreme circumstances—when the prejudice caused by the improper question and answer is incurable, i.e., "so prejudicial that expenditure of further time and expense would be wasteful and futile."  *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000).  In most instances, an instruction to disregard will cure the alleged harm.  *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).  We consider the following factors in determining whether the trial court abused its discretion by denying a motion for a mistrial: (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of punishment assessed absent the misconduct.  *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

Here, Buckholz was recounting the events of the burglary and assault at punishment and was explaining what White did after she told him that she had herpes when she made the complained-of statement:

> He stopped fighting.  He stopped pulling [my pajama pants] down.  He just froze.  And then he said that he didn't believe me. And I said that he could go and check in the cabinets in the kitchen [to look for medication].  And I knew that he had probably been in my house earlier that day . . . because my house—

Other than this vague reference to White being "in [her] house" earlier that day, no further references were made to the previous day's burglary during the second punishment trial, and any reference made to it at the guilt-innocence

19

stage of trial was made in front of a different jury.[5]  The trial court immediately instructed the jury to disregard the statement, and the court's charge on punishment instructed the jury that it could consider extraneous offense evidence only if it believed beyond a reasonable doubt that White committed such acts. We presume the jury followed these instructions absent evidence to the contrary. *See Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996).  The State presented compelling evidence that White entered Buckholz's home and attempted to sexually assault her while her son was in the room, including evidence that White's blood was found on her pajama pants, and the State presented evidence of the injuries sustained by Buckholz—a black eye, a busted lip, and injuries to her teeth.  White was sentenced to eighteen out of a possible ninety-nine years' imprisonment for count one.  *See* Tex. Penal Code Ann. § 12.32(a).  We hold that any harm caused by the complained-of statement was cured by the instruction to disregard and that, consequently, the trial court did not abuse its discretion by denying White's motion for mistrial.  We overrule White's fifth issue.

---

[5]During the guilt-innocence stage (in front of the prior jury), Buckholz testified that her home had been burglarized the day before White burglarized her home, but she did not testify, and the State did not attempt to prove, that White was involved in this burglary.

20

## VI. CONCLUSION

Having sustained White's second issue in part and overruled the reminder of White's issues, we vacate and dismiss the trial court's judgment on count two and affirm the trial court's judgment on count one.

SUE WALKER
JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

PUBLISH

DELIVERED:  February 21, 2013

21