Marilyn Marche KIRKLAND, Appellant

v.

The STATE of Texas, Appellee

No. 06-17-00055-CR

Court of Appeals of Texas,
Texarkana.

Date Submitted: October 16, 2017

Date Decided: November 15, 2017

Discretionary Review Refused
March 21, 2018

Jason D. Cassel, Albritton Law Firm, Longview, TX, Attorney for Appellant.

Laura M. Carpenter, Assistant District Attorney, Coke Solomon, District Attorney, Marshall, TX, Attorneys for Appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Josh R. Morriss, III, Chief Justice

After Marilyn Marche Kirkland admitted to having murdered Clinton Wayne Saizon in late 2015 by shooting him once in the chest with a handgun, the question of Kirkland's punishment and the bizarre facts of her case were submitted to a Harrison County jury. After a two-day punishment trial, the jury assessed Kirkland's punishment at forty years' imprisonment, as requested by the State. Though Kirkland had requested, and had been given, a jury instruction on temporary insanity by reason of voluntary intoxication, the instruction as given had improperly required her to prove such insanity beyond a reasonable doubt before the jury was authorized to consider that in assessing punishment. On appeal, Kirkland contends (1) that she suffered egregious harm from that erroneous jury instruction and (2) that it was error not to grant a mistrial based on allegedly improper comments made by the State. Because we find the erroneous jury instruction resulted in egregious harm, we reverse the trial court's judgment and remand this case for a new trial on punishment.

Saizon's body was found in his "camper-trailer, travel-trailer" in the presence of drug paraphernalia described as "pipes used for smoking methamphetamine and also some syringes used commonly to inject methamphetamine." Four days after Saizon's body was found, Kirkland gave a voluntary statement to the Waskom Police Department, which statement included a confession that she had shot Saizon.[1] Based on her statement, Kirkland was arrested and subsequently indicted for Saizon's murder.

---

1. The State offered, and the trial court admitted, a recording of Kirkland's confession.

 Kirkland contends the trial court erred in the way it charged the jury as to temporary insanity by voluntary intoxication.[2] The relevant portions of the charge are as follows:

You are further instructed that in determining the Defendant's punishment, you may take into consideration all of the facts shown by the evidence submitted before you in the full trial of this case and the law as submitted to you in this charge.

You are instructed that under our law neither intoxication nor temporary insanity of mind caused by intoxication shall constitute a defense to the commission of the crime. Evidence of temporary insanity caused by intoxication should be considered in mitigation of the penalty, if any, attached to the offense.

By the term "intoxication" as used herein is meant disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

By the term "insanity" as used herein is meant that as a result of intoxication the defendant did not know that her conduct was wrong.

Now, if you find from the evidence *beyond a reasonable doubt* that the defendant, Marilyn Marche Kirkland, at the time of the commission of the offense for which she is on trial was laboring under temporary insanity as defined in this charge, produced by voluntary intoxication, then you may take such temporary insanity into consideration in mitigation of the penalty which you attach to the crime.

(Emphasis added). Specifically, Kirkland contends that the trial court's error in including the "beyond a reasonable doubt" language was "unprecedented and egregiously harmed [her] ability to present a defensive theory."

 Our review of an alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we determine

---

2. "Evidence that the defendant was intoxicated at the time of the offense does not automatically entitle him to a mitigation instruction at punishment." *Meine v. State*, 356 S.W.3d 605, 611 (Tex. App.—Corpus Christi 2011, pet. ref'd) (citing *Miniel v. State*, 831 S.W.2d 310, 320 (Tex. Crim. App. 1992)). "Voluntary intoxication is *not* a defense to the commission of a crime; but evidence of *temporary insanity* caused by intoxication may be introduced by the actor in mitigation of punishment." *Arabie v. State*, 421 S.W.3d 111, 113 (Tex. App.—Waco 2013, pet. ref'd). A court must submit an instruction on insanity by intoxication only if the evidence tends to show the intoxication caused temporary insanity in the defendant. *Id.* (citing TEX. PENAL CODE ANN. § 8.04(b), (c) (West 2011)). Section 8.04 of the Texas Penal Code states,

(a) Voluntary intoxication does not constitute a defense to the commission of a crime.

(b) Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.

(c) When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

(d) For purposes of this section "intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body. TEX. PENAL CODE ANN. § 8.04 (West 2011). In order to raise the issue of insanity by voluntary intoxication for mitigation purposes, the evidence must establish that the defendant, as a result of intoxication (1) did not know his or her conduct was wrong, or (2) was incapable of conforming his or her conduct to the requirements of the law he or she violated. *Cordova v. State*, 733 S.W.2d 175, 190 (Tex. Crim. App. 1987). In this case, the trial court determined that the evidence supported the inclusion of an instruction on temporary insanity by reason of voluntary intoxication as it related to mitigation of punishment.

whether error occurred and then "determine whether sufficient harm resulted from the error to require reversal." *Id.* at 731–32); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). The level of harm that must be shown as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. When a proper objection is made at trial, a reversal is required if there is "some harm" "calculated to injure the rights of defendant." *Id.* As in this case, however, when the defendant fails to object to the charge, we will not reverse the jury-charge error unless the record shows "egregious harm" to the defendant. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza*, 686 S.W.2d at 171). In determining whether the error caused egregious harm, we must decide whether the error created such harm that the appellant did not have a "fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Almanza*, 686 S.W.2d at 171; *Boones v. State*, 170 S.W.3d 653, 660 (Tex. App.—Texarkana 2005, no pet.).

 The State concedes, and we agree, that it was error to include in the jury charge the requirement that Kirkland prove beyond a reasonable doubt that she

suffered from temporary insanity by reason of voluntary intoxication at the time of the commission of the offense.[3] However, the State contends that Kirkland was never entitled to an instruction on temporary insanity[4] and that, even if she was, the erroneously worded instruction did not rise to the level of egregious harm. Jury charge error is considered egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Almanza*, 686 S.W.2d at 172. We are required to consider (1) the entire jury charge, (2) the state of the evidence, (3) the parties' arguments, and (4) any other relevant information shown in the record of the trial as a whole. *Id.*; *see also Hutch v. State*, 922 S.W.2d 166 (Tex. Crim. App. 1996); *Bailey v. State*, 867 S.W.2d 42, 43 (Tex. Crim. App. 1993).

The larger frame for our determination is set by the fact that Kirkland had entered a plea of guilt to the murder and had placed her fate on the jury's assessment of her punishment. While the State painted the victim as positively as possible and Kirkland as negatively as possible, and the defense tried to do the converse, the two principal defense strategies were to try to establish that Kirkland would not likely be dangerous in the future and that, at the

3. In *Blue*, the Texas Court of Criminal Appeals held that neither party bears the burden of proof relating to mitigation evidence during the punishment phase of the proceedings. *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2004). "In instances where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury is able to consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." *Barnes v. State*, 876 S.W.2d 316, 329 (Tex. Crim. App. 1994).

4. Here, the trial court determined there existed sufficient evidence to support the inclusion

of the temporary insanity instruction. Contrary to the State's position, the issue of whether the trial court erred in its inclusion of a temporary insanity instruction is not before this Court; instead, we are tasked with addressing specifically the portion of the trial court's instruction that Kirkland was required to prove *beyond a reasonable doubt* that she suffered from temporary insanity by voluntary intoxication in order for the jury to consider such evidence for purposes of mitigating Kirkland's punishment, and whether that portion of the jury instruction resulted in egregious harm to Kirkland.

time of the offense, she was delusional due to her use of methamphetamine, clearly seeking to cause the jury to reduce her sentence based on Kirkland's temporary insanity caused by voluntary intoxication.

Here, the jury charge consisted of four pages and contained a single heading, entitled "General Principles." The majority of the trial court's instructions were general in nature, with the exception of the complained-of paragraph. The erroneous instruction lay at the center of Kirkland's only real structural defensive issue, was the only paragraph applicable directly to Kirkland, and incorrectly placed a specific, heightened burden of proof on her.

 Unless there is contrary evidence, we must presume that the jury followed the instructions set out in the charge. *Hutch*, 922 S.W.2d at 170; *see White v. State*, 395 S.W.3d 828, 839 (Tex. App.—Fort Worth 2013, no pet.). Since we find no evidence that the jury actually considered temporary insanity due to voluntary intoxication in assessing Kirkland's sentence—in fact assessing her exactly the forty years the State requested in both its opening and closing argument—we must conclude that the jury did not consider any lesser sentence as a result.[5] The question this raises is whether, but for the erroneous instruction, Kirkland had a real chance for the jury to lessen her sentence based on this defensive claim. Based on our evaluation of the arguments and the evidence, we conclude that she did and that, therefore, she was egregiously harmed by the erroneous instruction.

During its opening argument, the State argued that Kirkland decided to sacrifice her victim. By contrast, Kirkland's opening argument discussed, among other things, her mental illness and her drug addictions, as well as her turning to drugs after being abused and raped. The defense's opening argument also referred to her delusion that the victim may have been demonic. Kirkland's opening argument pointed out her delusions and claimed that the shooting was a result of her delusions. Kirkland explained that the evidence would show she suffered from mental health problems and that she had been using drugs on the day she committed the offense.

In its closing argument, the State visited the jury charge and its erroneous requirement that, before the jury could even consider Kirkland's claim of temporary insanity by reason of voluntary intoxication in its assessment of punishment, they must find it true beyond a reasonable doubt. The State's argument did not add any particular emphasis to the improper burden of proof, but focused on the instruction that, even if it so found, the jury would not be required to, but "may," consider it as a factor in sentencing.

Kirkland's closing argument noted the "bizarre facts" of the case and urged the jury to find her mentally ill and delusional that the victim was "the son of the devil." Her counsel argued, "I have no doubt that she thought [these delusions true at the time]." The argument continued with a request that, because of her temporary insanity, the jury should assess a punishment in the lower end of the available range. It emphasized her "delusional disorder" and her delusional thinking, reviewed expert testimony about reduced risk, and

---

5. During its deliberations, the jury sent out two notes to the trial court. One asked how long Kirkland had been in jail for the murder before she assaulted a fellow inmate over a bag of Cheetos. The other asked to see the medical report on Kirkland's post-murder attempted suicide, her video testimony, and the timeline of her rape and burglary. While one might conjure up a connection between these jury notes and Kirkland's defense of temporary insanity, such would be speculative in our opinion.

finally requested a sentence of between five and ten years. Moreover, in closing, Kirkland stated,

> This is a case of temporary insanity, folks. I have—I have no other box to put this in. When you look at the facts of this case, it is clear that this is one for the lower end of the punishment range, and this is the reason that the legislature made such a wide range of punishment.
>
> . . . .
>
> She's suffering from some profound mental health problems, and she has been victimized by this mental health issue.
>
> . . . .
>
> But then enter her uncle, who is a drug dealer. The drug abuse returns. A rape occurs. She suffers from [post-traumatic stress disorder (PTSD)]. She suffers from delusional disorder that you heard Dr. Andrews talk about. And she continued through that year to try to self-medicate, taking illegal drugs to make the pain go away.

The State's rebuttal argument in closing had a theme of Kirkland's "spin" that the victim was bad, that Kirkland was crazy with mental problems, and that Kirkland was loving and good. It challenged Kirkland's view on each of those topics and asked the jury to look through her "spin" on each. Near its end, the State's argument addressed Kirkland's claim of temporary insanity, without any reference to the erroneous burden of proof, and argued that she was not temporarily insane, but that she knew what she did was wrong.

Most of the evidence presented by the State, through various law enforcement officers and the victim's parents, told the story of the shooting and the surrounding events. The narrative included the discovery of the victim's body, the initial investigation, what the crime scene looked like, what items were found there, how Kirkland ultimately became the focus of their investigation, and how she was interviewed and taken into custody for the murder. During the State's case-in-chief, there appears to have been only one reference to the possibility that Kirkland may have been suffering from some kind of delusion.

A good portion of the defense's evidence, beyond attempts to humanize Kirkland to the jury and make sure the jury knew that the victim was not a sterling citizen, involved twin efforts: to paint Kirkland as only minimally dangerous in the future and to address her bizarre, apparently delusional, actions leading up to the murder.

Kirkland called Paul Andrews, Ph.D., a forensic psychologist,[6] to testify that Kirkland did not pose a great future risk and that she suffered from delusions, in part, intoxication-driven delusions. Andrews testified that, "in terms of [Kirkland's] mental health status and history, there was an indication that there had been mental health problems for some time, maybe even back to teenage years."[7] He continued that, "currently, there was indication of post-traumatic stress disorder symp-

---

**6.** Andrews explained that forensic psychology is "the study of human behavior within the legal context or it's the practice of psychology in the legal context either in consultation for attorneys or the Court or intervention for the same." According to Andrews, forensic psychology differs substantially from clinical psychology because "[c]linical psychology is usually treating or assessing a person for a mental health condition that may or may not have any consequences beyond that person's life." In contrast, forensic psychology is "a much more neutral or objective point of view that seeks to provide information for someone other than the person being examined."

**7.** Andrews testified that he met with Kirkland for approximately seven hours over a period of two days.

toms, some indications of depression. Certainly, there was indication of history of substance abuse and delusions, things that a person strongly believes that have no basis in reality." Andrews explained that Kirkland emphasized the number three and that she believed that "something bad was going to happen either on the 3rd or at 3:00 o'clock." According to Andrews, Kirkland spoke with him about sprinkling baby powder around her door and around her bed in order to determine if someone was walking into her room at night while she was sleeping. In addition to other strange behavior, Andrews stated that Kirkland's family members indicated that Kirkland had asked for help not long before the murder because she could not sleep "or because there were things going on in her head that she could not understand."

Most of Andrews' testimony focused on trying to portray her as not particularly dangerous in the future, but there was some key testimony on her delusions:

Q And I've provided you information from the Penal Code concerning temporary insanity because of intoxication, correct?

A Correct.

Q You've read those definitions?

A Yes.

Q Describe for the jury what your evaluation of those definitions is with respect to this case and the incident in question.

A In this case, it looks like there was a preexisting mental health problem. Post-traumatic stress disorder is the most likely. But there's also indications of some kind of delusional disorder that may have preceded, may have followed the use of methamphetamine. So it's

hard to tease that out. There was some suggestion that this is a disorder that was not just based on the use of drugs, that it sustained itself even when there was not drug use. So the result that I came to was that there was a delusional disorder. It may have been induced by drugs. It certainly was made worse by drug use. And that in the context of a particular event, a person's judgment, a person's reality testing would be seriously compromised because of that delusional disorder.

While this testimony is somewhat ambiguous, the testimony is an opinion from an expert that Kirkland's delusions were made worse by her drug use, evidence which, with the various other evidence, would allow a jury, if charged correctly on the burden of proof, to find temporary insanity by reason of voluntary intoxication and thus to consider that to ameliorate Kirkland's sentence.

Kirkland's cousin and friend, Twila Griffin, portrayed her as happy and hardworking before she lost her father and succumbed to drug use. Griffin quoted Kirkland as admitting, two days before the shooting, that she was using drugs. Griffin testified that Kirkland previously had been a sane individual but that she was not sane in November 2015, because she was strung out on methamphetamine and was having hallucinations.

Kirkland's statement to police claims that she was not a violent person but that, when she "shot up some drugs," "apparently [she] trip[ped] on them." Kirkland's statement said that she and Saizon had been reading the Bible for approximately two hours the night of the shooting[8] and that Saizon told her that he was supposed to be sacrificed. Kirkland stated that Sai-

---

8. According to Kirkland, the pair began reading the Bible at 1:00 a.m., and continued to do so until 3:00 a.m., which was when she shot Saizon.

zon had a gun and that initially he kept it next to him on his right side. Eventually Saizon placed the gun beside Kirkland's right hand, while discussing the "right hand" as the term was used in the Bible. Kirkland emphasized the Bible's use of the number "three" and that she had shot Saizon at 3:00. a.m. After Saizon made a comment about "go[ing] back to that black cave of [his]," Kirkland thought "he was the devil just sitting here." Kirkland said she picked up the gun and told Saizon, "[The Bible's] telling me to do this." According to Kirkland, the pair understood "that [they] both knew we had to be sacrificed." Kirkland stated that, immediately after shooting Saizon, she left the mobile home and "tossed" the gun into a ditch that was located approximately a quarter of a mile from Saizon's mobile home.[9] Shortly after giving her statement, Kirkland took officers to the location in which she had disposed of the gun. After a brief search, officers located the weapon.

Kirkland stated that she would refrain from using drugs during the week, but that she would "binge" on them during the weekend. According to Kirkland's testimony, on the day of the incident, Kirkland, Saizon, and a mutual friend of theirs, Dusty Martin, had gone fishing at a pond behind Saizon's mobile home. When they were finished fishing, Kirkland and Martin went inside of Saizon's mobile home and

proceeded to inject methamphetamine, while Saizon went to another building on the property. Kirkland stated that she and Martin began "talk[ing] about sacrifices and—because at the time, [she] felt like [she] had to be sacrificed." Kirkland said she had been having that thought the entire day. She stated, "I told Dusty to just sacrifice me. I told him that my biggest fear was to die a slow death, and I told him to sacrifice me." When asked how Martin responded, Kirkland explained that he asked her "how" she wanted to be sacrificed, to which she responded, "Shoot me." After having been there approximately an hour, Martin left Saizon's mobile home. Kirkland explained that, at that point, she believed that, because Martin left, Saizon would kill her.

She indicated her belief that the victim had "died" before and was therefore immortal and, thus, "the son of the devil." Though she believed it at the time of the shooting, she realized at the time of trial that it was not true. She recounted reading excerpts from the Bible with the victim that evening and the two of them interpreting the excerpts to mean that one or both of them needed to be sacrificed. A gun was produced by the victim and put at Kirkland's right hand, and the Bible was quoted that "protection is at your right hand." She testified also that the fatal shot

9. After Kirkland left Saizon's mobile home, she went to the emergency room at the hospital. Her medical records, which were admitted into evidence, show Kirkland had informed medical personnel that she had a history of substance abuse; in particular, the use of methamphetamine. Kirkland reported that she had recently "binge[d]" on the drug. The record shows Kirkland's "presenting complaint" had been "PT USED METH YESTERDAY AROUND 1600 ... COULDN'T SLEEP AROUND 0900 THIS MORNING TOOK 9 TABLETS OF TRAZADONE 100MG TAB. PT DENIED SUICIDAL THOUGHT OR HOMICIDAL THOUGHTS. JUST WANTED TO GO TO SLEEP." Under the heading "Psych," the medical records read: "09:54 Subjective: Patient's mood is sad, Delusions are denied, Hallucinations ... are denied Having thoughts of PT DENIES THOUGHTS OF SUICIDAL OR HOMICIDAL. Objective: Patient is cooperative, Speech is normal, Affect is appropriate. Patient uses methamphetamines Last use was 1 days ago." The record also contained a note explaining that Kirkland's aunt had informed medical personnel that Kirkland had recently threatened to kill her and that Kirkland had stated that she "WANTED TO DIE."

was fired at 3:00 a.m. That timing connects eerily to testimony from Andrews that one of Kirkland's delusions was about an otherwise innocent reference to the number three, from which Kirkland concluded that something would happen on the third day of the month or at three o'clock.

Brenda Kirkland (Brenda), Kirkland's mother, testified that Kirkland was a good mother and that she was very involved in her children's lives. According to Brenda, Kirkland's behavior changed after she was assaulted by her uncle. "She just—she changed. She was very paranoid. She—she hallucinated." Brenda also said that it was apparent to her that Kirkland had a substance abuse issue "[b]ecause she told me, for one." Brenda testified that Kirkland "didn't care anymore" and that she was "[a]lways scared. Always running from somebody. She thought [her uncle] had people after her." "She would ask me to call [her uncle] and ask him to ask the people that were flying helicopters over the house to stop." Brenda testified that Kirkland would remove family photographs from the wall and tear them apart in order to "look for the codes that [her uncle] had hid behind the pictures." Despite making an effort to do so, Brenda was unable to convince Kirkland that these things did not exist. Brenda explained that, following one of Kirkland's hospital visits, Kirkland believed that her own eyeballs had been removed and that they "put somebody else's eyes back in her head." Brenda said that, after Kirkland was allegedly assaulted by her uncle, Brenda encouraged her to report the assault and that Kirkland did report the assault to the Panola County Sheriff's Department; however, as far as Brenda knew, nothing was ever done about it. She also stated that the family had taken Kirkland to five different hospitals on seven separate occasions in an effort to get Kirkland medical assistance.

According to Brenda, on the day of the shooting, Kirkland contacted Brenda to tell her "that she had done something stupid" and to ask her to "please come over and hold her until she fell asleep." On her arrival, Brenda found a prescription bottle containing sleeping pills; however, the bottle was almost empty. Brenda estimated that Kirkland had taken approximately fifteen pills, so she called for an ambulance to take Kirkland to the hospital. Brenda explained that Kirkland was in the hospital for one day and that when she was released, she was admitted to "Kilgore mental hospital" for suicide intervention.

Here, Kirkland pled guilty to the charge of murder and sought to mitigate the jury's assessment of punishment by presenting evidence that she suffered from mental health issues, substance-abuse problems, or a combination of both and that, on the evening of the incident, those deficits played a vital role in her actions. To require Kirkland to prove these assertions beyond a reasonable doubt effectively eviscerated her mitigation evidence if the jury determined that she had not satisfied the erroneous burden of proof. We therefore find that the complained-of instruction deprived Kirkland "of a valuable right, or vitally affected a defensive theory," thereby causing her egregious harm. *See Almanza*, 686 S.W.2d at 172.

We sustain this point of error.[10]

We reverse the judgment of the trial court and remand these proceedings for a new trial on punishment.

---

10. Due to our treatment of Kirkland's first point of error, we do not find it necessary to address her second point of error.