

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00190-CR

———————————————————

EMILIO MORALES, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. F18-2442-158

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Appellant Emilio Morales pleaded guilty to murdering his seven-week-old son, and the jury sentenced him to life in prison. *See* Tex. Penal Code Ann. § 19.02(b)(3). His three appellate issues all rise and fall on the voluntariness of his confession.[1] Specifically, Morales contends that the police detectives induced him to confess by promising that no matter what he said during his noncustodial interview, he would not be arrested and would be released from the police station. Because we hold that the detectives' statements did not render Morales's confession involuntary, we will affirm.

## I. Background

In June 2018, Morales woke up his girlfriend, D.M. (Mother), and told her that their seven-week-old son, M.M. (Son), had stopped breathing. Panic ensued, and although the family called 911, when the paramedics arrived about five minutes later, Son was already dead, and the paramedics concluded that lifesaving efforts would be futile.[2]

---

[1]Morales argues that (1) his noncustodial confession to police was involuntary and the trial court erred by failing to suppress it; (2) if the trial court had suppressed his confession, he would not have pleaded guilty and the evidence would have been insufficient to support a finding of guilt; and (3) if the trial court had suppressed his confession and he had not pleaded guilty, the evidence would have been insufficient to support his life sentence.

[2]One of the paramedics who responded to the scene indicated that Son had "lividity" which he described as "basically the blood pool[ing] to the lower extremities or the lower part of the body" as "gravity kind of pulls it."

Detectives Salazar and Sanchez investigated. Detective Sanchez spoke with Morales and Mother at their home on the day of Son's death, and the next day, he called Morales and asked if he and Mother would come to the police station for an interview. Detective Sanchez later testified that he "told [Morales] that once [they] were done with the interview, that he could tend to the errands that he needed to run" and "would be released." The detective confirmed on cross-examination that his assurance of release was "[r]egardless of what [Morales] said" in the interview. Morales agreed to come to the station.[3]

In the noncustodial,[4] videotaped interview that followed, Morales confessed to killing Son by repeatedly hitting him in the head with a closed fist.[5] He demonstrated how he had killed Son by using a baby doll. Cradling the doll close to his body,

---

[3]At the station, Detective Salazar assured Morales that they would "talk [only] for as long as you want to talk." Morales indicated that another family member was "in the car waiting."

[4]Morales does not dispute that the interview was noncustodial.

[5]In his videotaped interview, Morales told the detectives that he woke up with Son for Son's 3:00 a.m. feeding to allow Mother to sleep. Mother, too, confirmed that this had been the plan. But when Morales testified at trial, Morales told the jury that he killed Son around 11:00 p.m. while Mother was in the restroom.

Morales pounded the doll four times[6] in the head with a closed fist, each time using enough force to cause a loud cracking sound.[7]

After Morales confessed, he questioned whether he was going to be "lock[ed] up forever," but Detectives Salazar and Sanchez reassured him that he would still be permitted to leave the police station.[8]  When he left, though, the detectives obtained an arrest warrant, and he was arrested later that day.

After Morales was indicted for murder, he moved to suppress his confession as involuntary.  *See* Tex. Code Crim. Proc. Ann. art. 38.21.  The trial court held a suppression hearing, then it denied the motion to suppress and issued findings of fact

---

[6]At trial, Morales testified that he hit Son three times rather than four.

[7]The deputy medical examiner who performed Son's autopsy testified that, given Son's injuries, Morales likely used even greater force than that demonstrated in the video.  The autopsy report noted that Son had "[n]umerous displaced skull fractures," "[n]umerous contusions," and numerous hemorrhages, all caused by "[b]lunt force."  One of the investigators who had responded to the scene of Son's death stated that, when he touched the back of Son's head, it was "very soft [and] pliable" and "felt like a water balloon."

When Morales testified at trial, he acknowledged that he "probably hit [Son] a little harder than [he] admitted to in the interview."

[8]When Morales bemoaned that the detectives "[we]re going to lock [him] up forever," Detective Salazar told him "you're going home, man."  Later, when Morales repeated that he was "going to be put away," Detective Sanchez told him, "you came here on your own . . . [and] you're going to leave on your own."  Detective Salazar agreed, saying "we told you that to begin with and we are men of our word."  Even then, Morales was skeptical, asking "Why would I get to go home? . . . I hurt my son[.]"  But the detectives told him that he could leave with his family and that they would talk to their boss, "see what he says," and "take it from there."

4

and conclusions of law.[9]  Morales subsequently pleaded guilty to murder without a plea bargain.  *See* Tex. Penal Code Ann. § 19.02(b)(3).  The jury sentenced him to life in prison with a $10,000 fine.[10]

## II. Voluntariness of Confession

On appeal, Morales argues that (1) his noncustodial confession to police was involuntary and the trial court erred by failing to suppress it; (2) if the trial court had suppressed his confession, he would not have pleaded guilty and the evidence would have been insufficient to support a finding of guilt; and (3) if the trial court had suppressed his confession and he had not pleaded guilty, the evidence would have been insufficient to support his life sentence.  Suppression is thus the pivotal issue.

We review a trial court's denial of a motion to suppress using a bifurcated standard—we give almost total deference to the trial court's rulings on fact questions,

---

[9]These findings included, among other things, that (1) Morales "was informed that he was free to leave at any time" and (2) the detectives "never made any promises that were for a positive benefit" or that "would cause the Defendant to speak untruthfully."

[10]At trial, the jury was presented with evidence that Morales had a history of drug abuse, that he had used methamphetamine one to two days before he killed Son, that he would disappear for days at a time without contact or explanation, that he had a gambling problem, that he had started dating and sleeping with Mother—who was five years younger than him—when she was 15 or 16 years old, that he had committed numerous criminal offenses, and that he had failed to complete community supervision and drug treatment programs in the past.  The jury also heard testimony that, in light of the severity of Son's injuries, he would have become symptomatic "[p]retty rapidly," and "it would have been obvious that something was wrong."

and we review de novo application-of-law-to-fact questions that do not turn on a witness's credibility or demeanor.[11] *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *McCurley v. State*, 653 S.W.3d 477, 484 (Tex. App.—Fort Worth 2022, pet. filed).

Morales raises his suppression challenge under Article 38.21 of the Code of Criminal Procedure, which authorizes a defendant's statement to be used against him "if it appears that the same was freely and voluntarily made without compulsion or persuasion." Tex. Code Crim. Proc. Ann. art. 38.21. Morales contends that his confession was involuntary because "at several points before and during the interview with [Morales], [Detective Sanchez] promised [him that] he would not be arrested."[12]

---

[11]"In determining whether a trial court's decision is supported by the record, "we generally consider only evidence adduced at the suppression hearing" unless "the suppression issue has been consensually relitigated by the parties during trial on the merits." *McQuarters v. State*, 58 S.W.3d 250, 255 (Tex. App.—Fort Worth 2001, pet. ref'd); *see Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). Here, the issue was not consensually relitigated by the parties at trial. When the State broached the voluntariness issue at trial, Morales immediately objected "on the basis of the pretrial matter that ha[d] already been ruled on by the Court." The trial court sustained the objection and reiterated that its "ruling ha[d] not changed" and "w[ould] remain as it was at the motion to suppress." We therefore limit our review of the suppression issue to the evidence adduced at the suppression hearing. *See Rachal*, 917 S.W.2d at 809; *McQuarters*, 58 S.W.3d at 255.

[12]The argument section of Morales's brief does not cite to the record nor does it quote any statements from the suppression hearing or videotaped interview. *Cf.* Tex. R. App. P. 38.1(i) (requiring argument section to contain "appropriate citations . . . to the record"). Instead, Morales paraphrases the alleged promises of release.

6

For a promise to render a confession involuntary under Article 38.21, the promise must be (1) positive, (2) made or sanctioned by a person in authority, and (3) of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State,* 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *McCurley*, 653 S.W.3d at 486; *cf. White v. State*, 395 S.W.3d 828, 837 (Tex. App.—Fort Worth 2013, no pet.) (listing as a fourth factor that the promise must be of some benefit to the defendant). The third element is dispositive in this case; Detective Sanchez's alleged promises were not "of such an influential nature that [they] would cause a defendant to speak untruthfully." *See Martinez,* 127 S.W.3d at 794; *McCurley*, 653 S.W.3d at 486.

The statements made during Morales's videotaped interview are the simplest to resolve, as all such statements were recorded. And the videotape reveals that, although Detective Sanchez told Morales that he would not be arrested and would be permitted to leave, those assurances came after Morales had already confessed.[13] Logic dictates that the detective's videotaped statements regarding Morales's arrest and release could not have induced Morales's confession if the statements had not yet been made at the time of the confession. *See Storey v. State*, No. AP-76,018, 2010 WL 3901416, at *9 (Tex. Crim. App. Oct. 6, 2010) (not designated for publication) (noting

---

[13]Morales has not cited or quoted any specific portion of the videotape to direct our attention to a pre-confession promise of release. And although Detective Salazar began the discussion by telling Morales that they would "talk [only] for as long as [Morales] want[ed] to talk," Morales does not claim that this introduction—or any other statement made by Detective Salazar—induced his confession.

that law enforcement's alleged promise "was made after appellant had given his first statement, and so it could not have influenced appellant's decision to give that statement").

This leaves us with the alleged promises of release uttered before the videotaped interview, i.e., when Detective Sanchez called Morales to ask him to come to the police station.[14] Although the phone call was not recorded, Detective Sanchez testified at the suppression hearing regarding what was said:[15]

> *[Detective Sanchez].* [I] explained to him that after the interview, he would be released. I explained to him during the phone conversation that he could go and do -- take care of the errands that he needed to take care of.
>
> *[Morales's Counsel].* Okay. But, again, regardless of what he says during the interview. So if he gives a full confession, he's still going to be allowed to leave?
>
> *[Detective Sanchez].* That is correct.

[Indentation altered.] Based on this testimony, Morales claims that Detective Sanchez "admit[ted]" that he had promised Morales that he "would not be arrested after he

---

[14]During the suppression hearing, Morales's counsel conceded that, although Detective Sanchez indicated on the phone that he "[was] not going to arrest [Morales]," he did so "in a vague way." Counsel "agree[d] that [the alleged promise] was not directly said prior to coming to the station." Because Morales's trial counsel acknowledged that the detectives did not make a positive promise to Morales before he came to the police station, Morales has arguably waived the challenge he raises on appeal. *See* Tex. R. App. P. 33.1(a)(1)(A) (requiring a complaining party to "make the trial court aware of the complaint").

[15]Morales did not testify at the suppression hearing.

8

came to the police station . . . no matter what he might say, including whether he confessed . . . or not." Whether this is an accurate summary of the evidence is debatable.[16] Regardless, to the extent that Detective Sanchez promised that Morales would be released "whether he confessed . . . or not," there was no incentive for Morales to confess at all, much less to do so untruthfully.

We addressed a similar alleged promise in *White v. State*. 395 S.W.3d at 837–38. There, the defendant admitted to his crimes in a noncustodial, videotaped interview.[17] *Id.* at 831–32. White later moved to suppress his confession as involuntary because

---

[16]The broad language used in Morales's brief implies that he was promised he would never be arrested. But this is not an accurate reflection of the evidence, and reading Morales's brief as a whole, he does not appear to intend such a broad allegation. Morales instead contends that the detectives promised not to arrest him at the conclusion of the interview, so even though he was ultimately arrested, he concedes that he "received the benefit of [the detectives'] promise, [because] he was not arrested and [was] free to leave" when the interview ended.

Morales's brief also uses the term "arrest" as the opposite of "release"; he construes Detective Sanchez's pre-interview statements regarding his release as statements guaranteeing that he would not be arrested. But the terms "arrest" and "release" are not as cleanly related as Morales assumes. For example, an individual may be released on bond even if he has been arrested, and even if he has not been arrested, he may be temporarily detained. Plus, when Morales's counsel attempted to elicit testimony from Detective Sanchez that he had promised not to arrest Morales, those attempts were unsuccessful, and Detective Sanchez merely reiterated that he told Morales "that after the interview, he would be released."

[17]Prior to the confession, White committed burglary and attempted sexual assault, and then he fled with the victim's cell phone. *White*, 395 S.W.3d at 831. The police traced the cell phone to White, and they found him at a park. *Id.* When they asked him to come to the police station to discuss a stolen cell phone, he agreed to go. *Id.*

9

the detectives "promise[d]" him that, among other things, "they would return him to his grandmother's house after the interview regardless of what he told them." *Id.* at 837. We held that the alleged promise was not likely to induce an untruthful confession: "The detectives did not condition their returning White to his home upon him telling the truth[—]the detectives simply said they would drive White home after the interview, and they did so." *Id.* at 837–38. Nothing in the detectives' statements made White believe that he had something to gain by confessing. *Id.* at 838 (contrasting White's case with others in which, for example, defendant was promised immunity for crimes if he confessed).

Here, as in *White*, the pre-interview statements regarding Morales's release did not incentivize a false confession. Morales claims that he was told that he would be released after the interview regardless of what he said, so he had nothing to gain by confessing—he would be released either way.[18] Therefore, the trial court did not err by holding that Morales's confession was voluntary and, in turn, denying his motion to suppress. We overrule Morales's first issue.

---

[18]As in *White*, the detectives released Morales before they arrested him with a warrant. *See id.* at 832, 837. Morales emphasizes this as an aggravating factor, implying that he was released only because doing so was necessary to fulfill the detectives' promise. But the detectives testified that, rather than conducting a warrantless arrest of a suspect at the end of an interview, their standard practice was to seek an arrest warrant.

10

And because Morales's second and third issues hinge on his first,[19] we overrule those as well. *See* Tex. R. App. P. 47.1.

### III.  Conclusion

Having overruled Morales's issues, we affirm the trial court's judgment.  Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  January 26, 2023

---

[19]According to Morales, his confession should have been suppressed as involuntary, and if it had been, he would not have pleaded guilty, and without the confession or plea, there would have been insufficient evidence to find him guilty or sentence him to life in prison.  Presumably, Morales would also contend that, if he had not confessed or pleaded guilty, he would not have admitted to the murder when he testified at trial.  Either way, the hypothetical structure of Morales's second and third issues implicitly recognizes that the current state of the evidence—containing Morales's confession and plea—is sufficient to support his conviction and sentence.